# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

HAFF POULTRY, INC.; NANCY BUTLER;
JOHNNY UPCHURCH; JONATHAN WALTERS;
MYLES B. WEAVER; MELISSA WEAVER; and
all others similarly situated,

       Plaintiffs,

     v.

KOCH FOODS, INC.;
KOCH MEAT CO, INC.,
d/b/a KOCH POULTRY CO.;
SANDERSON FARMS, INC.;
SANDERSON FARMS, INC. (FOOD DIVISION);
SANDERSON FARMS, INC.
(PROCESSING DIVISION); and,
SANDERSON FARMS, INC.
(PRODUCTION DIVISION),

       Defendants.

No. 7:18-cv-00031-D

## DEFENDANTS' MEMORANDUM OF LAW
## IN SUPPORT OF THEIR JOINT MOTION TO DISMISS
## <u>UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)</u>

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ iii

NATURE OF THE CASE .................................................................................................... 1

STATEMENT OF ALLEGED FACTS ................................................................................ 3

    A.    The Tournament System and Agri Stats ................................................. 4

    B.    Procedural History .................................................................................. 5

ARGUMENT ....................................................................................................................... 6

I.    Plaintiffs Have Failed to Allege an Agreement by Defendants Not to Poach Each Other's Growers ................................................................................................. 7

    A.    Plaintiffs Do Not Plead Direct Evidence of a No-Poach Conspiracy. ................... 7

    B.    Plaintiffs Fail to Allege Circumstantial Evidence of a Plausible Conspiracy. ....................................................................................... 8

        1.    Plaintiffs Have Not Alleged Parallel Conduct ............................................. 9

        2.    Plaintiffs Have Not Sufficiently Alleged That Any Parallel Conduct Was the Result of a Plausible Agreement. ................................ 11

II.    The Complaint Does Not Allege a Plausible Information-Exchange Conspiracy ............ 14

    A.    Plaintiffs Cannot Plead a *Per Se* Antitrust Violation. ............................................ 14

    B.    Plaintiffs Fail to Allege an Information Sharing Agreement Between Defendants Regardless of the Standard Applied. ................................................. 17

        1.    Plaintiffs Do Not Plead An Agreement *Between Defendants* to Exchange Information. .............................................................................. 17

        2.    There Is an Obvious, Alternative Explanation for Defendants' Participation in Agri Stats. ....................................................................... 19

        3.    Plaintiffs Do Not Sufficiently Plead "Plus Factors." ............................... 21

    C.    Plaintiffs Cannot Maintain a Claim Under the Rule of Reason Because They Have Not Pled Anticompetitive Effects in a Plausible Geographic Market. ............................................................................................................. 21

        1.    Plaintiffs Fail to Allege a Plausible Geographic Market. ........................ 22

2.      Plaintiffs Fail to Allege an Anticompetitive Effect on Grower Pay. ........ 25

III.    Plaintiffs' Packers and Stockyards Act Claim Must Also Be Dismissed. ........................ 27

IV.    The Complaint Alternatively Should Be Dismissed Under the First-Filed Rule.............. 28

CONCLUSION ........................................................................................................................ 29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*,
  367 F.3d 212 (4th Cir. 2004) ...........................................................................7, 8

*Am. Dental Ass'n v. Cigna Corp.*,
  605 F.3d 1283 (11th Cir. 2010) ..........................................................................12

*Am. Needle, Inc. v. Nat'l Football League*,
  560 U.S. 183 (2010)..........................................................................................21

*Been v. O.K. Indus., Inc.*,
  495 F.3d 1217 (10th Cir. 2007) ..........................................................................26

*Bell Atlantic Corp. v. Twombly*,
  550 U.S. 544 (2007)................................................................................. *passim*

*Burtch v. Milberg Factors, Inc.*,
  662 F.3d 212 (3d Cir. 2011)...............................................................................16

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
  817 F.3d 46 (2d Cir. 2016)..................................................................................22

*Cont'l Airlines, Inc. v. United Airlines, Inc.*,
  277 F.3d 499 (4th Cir. 2002) .......................................................................14, 21

*Copperweld Corp. v. Independence Tube Corp.*,
  467 U.S. 752 (1984)............................................................................................21

*Crain v. Debartolo*,
  2015 WL 73961 (E.D.N.C. Jan. 6, 2015) ............................................................23

*Credit Bureau Servs., Inc. v. Experian Info. Sols.*,
  2012 WL 6102068 (S.D. Fla. Dec. 7, 2012) ........................................................13

*Dickson v. Microsoft Corp.*,
  309 F.3d 193 (4th Cir. 2002) .......................................................................17, 24

*Drake v. Cox Comm., Inc.*,
  2011 WL 2680688 (D. Kan. July 8, 2011) ..........................................................23

*In re Garlock Sealing Techs. LLC*,
  2017 WL 2539412 (W.D.N.C. June 12, 2017) .......................................................5

*In re Graphics Processing Units Antitrust Litig.*,
527 F. Supp. 2d 1011 (N.D. Cal. 2007) ...............................................................24

*Hall v. United Air Lines, Inc.*,
296 F. Supp. 2d 652 (E.D.N.C. 2003)............................................................12, 13

*Hanger v. Berkley Grp., Inc.*,
2015 WL 3439255 (W.D. Va. May 28, 2015) .......................................................23

*Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*,
2012 WL 1825331 (E.D.N.C. May 18, 2012) .......................................................27

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)...................................................................................16

*InterVest, Inc. v. Bloomberg, L.P.*,
340 F.3d 144 (3d Cir. 2003).....................................................................................7

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) .................................................................................24

*K-Flex, Inc. v. Armacell, Inc.*,
299 F. Supp. 3d 730 (W.D.N.C. 2017) ..................................................................21

*Kleen Prod. LLC v. Int'l Paper*,
276 F. Supp. 3d 811 (N.D. Ill. 2017) ................................................................9, 20

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
551 U.S. 877 (2007)...............................................................................................14

*London v. Fieldale Farms, Inc.*,
410 F.3d 1295 (11th Cir. 2005) .............................................................................26

*In re LTL Shipping Services Antitrust Litigation*,
2009 WL 323219 (N.D. Ga. Jan. 28, 2009)............................................................9

*M & M Poultry, Inc. v. Pilgrim's Pride Corp.*,
281 F. Supp. 3d 610 (N.D. W. Va. 2017) ..............................................................23

*Maple Flooring Mfrs.' Ass'n v. U.S.*,
268 U.S. 563 (1925)..........................................................................................15, 20

*Merck-Medco Managed Care, LLC v. Rite Aid Corp.*,
201 F.3d 436 (4th Cir. 1999) .................................................................................11

*Monsanto Co. v. Spray-Rite Serv. Corp.*,
465 U.S. 752 (1984)...............................................................................................21

*Mylan Labs., Inc. v. Akzo, N.V.*,
770 F. Supp. 1053 (D. Md. 1991) ............................................................................17

*Ohio v. Am. Express Co.*,
138 S. Ct. 2274 (2018) ...................................................................................21, 24

*Philson v. Goldsboro Mill. Co.*,
164 F.3d 625 (4th Cir. 1998) (unpublished) ............................................................26

*In re Processed Eggs Prods. Antitrust Litig.*,
206 F. Supp. 3d 1033 (E.D. Pa. 2016) ...................................................................15

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
801 F.3d 412 (4th Cir. 2015) ...................................................................... *passim*

*Seabury Mgmt., Inc. v. Prof'l Golfers' Ass'n of Am., Inc.*,
52 F.3d 322 (4th Cir. 1995) ..................................................................................22

*St. Paul Fire & Marine Ins. Co. v. Renne Acquisitions Corp.*,
2010 WL 2465543 (W.D.N.C. June 14, 2010) .........................................................27

*Stand Energy Corp. v. Columbia Gas Transmission Corp.*,
521 F. Supp. 2d 537 (S.D.W. Va. 2007) ..................................................................18

*Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*,
738 F. Supp. 2d 505 (D. Del. 2010) .................................................................7, 19

*U.S. ex rel. Szymoniak v. ACE Sec. Corp.*,
2014 WL 1910876 (D.S.C. May 12, 2014) ..............................................................28

*Tigard Elec., Inc. v. Nat'l Elec. Contractors Ass'n*,
790 F. Supp. 1498 (D. Or. 1992) ............................................................................25

*Todd v. Exxon Corp.*,
275 F.3d 191 (2d Cir. 2001) (Sotomayor, J.) ....................................................14, 22

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
552 F.3d 430 (6th Cir. 2008) .................................................................................18

*Turner v. Virginia Dep't of Med. Assistance Servs.*,
230 F. Supp. 3d 498 (W.D. Va. 2017) .....................................................................10

*United States v. Citizens & S. Nat'l Bank*,
422 U.S. 86 (1975) ................................................................................................15

*United States v. eBay, Inc.*,
968 F. Supp. 2d 1030 (N.D. Cal. 2013) ..................................................................16

*Uretek USA, Inc. v. Applied Polymerics, Inc.*,
    2011 WL 6029964 (E.D. Va. Dec. 5, 2011) ........................................................23

*Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co.*,
    386 F.3d 581 (4th Cir. 2004) ..............................................................................27

*Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*,
    2010 WL 11561770 (E.D.N.C. Mar. 1, 2010) (Dever III, J.) ..............................28

*Wheeler v. Pilgrim's Pride Corp.*,
    591 F.3d 355 (5th Cir. 2009) (en banc) ..............................................................26

*White v. R.M. Packer Co.*,
    635 F.3d 571 (1st Cir. 2011) ...............................................................................13

*Worthington v. Bayer Healthcare, LLC*,
    2012 WL 1079716 (D.N.J. Mar. 30, 2012) ..........................................................27

## Statutes

7 U.S.C. § 192(a) ...........................................................................................................26

7 U.S.C. § 192(f)(3) ........................................................................................................26

7 U.S.C. §192(g) .............................................................................................................26

## Other Authorities

Thomas M. Jorde & David J. Teece, *Rule of Reason Analysis of Horizontal
    Arrangements: Agreements Designed to Advance Innovation and
    Commercialize Technology* .................................................................................14

## Regulations

9 C.F.R. § 201.3 ...............................................................................................................4

9 C.F.R. § 201.100 ...........................................................................................................4

## NATURE OF THE CASE

Plaintiffs challenge longstanding, transparent, and government-regulated practices in the chicken industry as an antitrust conspiracy. For decades, chicken producers like Defendants have contracted out the process of raising chicks into slaughter-ready birds to farmers known as "Growers" located near their plants. And for decades, some Growers have felt dissatisfied—with contract terms, with compensation, or with their perceived difficulty moving to alternative producers. Plaintiffs now attempt to shoehorn this generalized dissatisfaction into antitrust claims asserting a purported industry-wide "Scheme" by Defendants and a crowd of 18 co-conspirators not to compete for Grower services. But the shoe does not fit.

The overarching "Scheme" Plaintiffs assert comprises two alleged agreements supposedly dating back to 2008. *First*, Plaintiffs allege a purported "no poaching" agreement among Defendants not to recruit or hire Growers contracted by another producer. (Dkt. 1 ("Compl.") ¶¶ 3, 68.) *Second*, Plaintiffs challenge as anticompetitive Defendants' submission of cost information to an independent third party, Agri Stats, for use in benchmarking (*i.e.*, performance comparison) reports. (Compl. ¶¶ 2, 69.) As set forth below, neither alleged agreement is sufficiently pled or plausible.

**"No Poaching" Agreement.** Plaintiffs fail to plead any direct factual support for their allegation that Defendants agreed not to "poach" (recruit or hire) each other's Growers. They rely almost entirely on a handful of vague, speculative anecdotes from unidentified Growers, none of which even pertains to Defendants or indicates those involved had first-hand knowledge to support their stories. (Compl. ¶¶ 84–88.)

Moreover, Plaintiffs fail to allege any circumstantial factual support for the existence of a "no poaching" agreement, such as parallel conduct. Indeed, Plaintiffs do not even specify how the two Defendants *in this case* were supposedly involved in this alleged conspiracy, relying

instead on indeterminate assertions against a so-called "Cartel." (Compl. ¶¶ 83, 89.) As a matter of Fourth Circuit law, this type of non-specific, generalized pleading is insufficient to allege a conspiracy. *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422–23 (4th Cir. 2015). Regardless, Plaintiffs admit that Growers do switch producers and fail to plead even one instance where a Defendant refused to consider hiring a competitor's Grower. (Compl. ¶¶ 89–92.) Finally, the Complaint concedes that an obvious, alternative explanation exists for why only limited switching occurs: Growers invest significant amounts to meet company-specific requirements, creating high switching costs for Growers to move to a new producer. (*E.g.*, *id.* ¶¶ 56–68.) In sum, Plaintiffs fail to plausibly allege the "no poach" leg of the purported "Scheme."

**Information-Sharing Agreement.** Plaintiffs' claim that Defendants entered an agreement to share information through Agri Stats is also wholly inadequate. As an initial matter, Plaintiffs' allegations are pled under the wrong legal standard. Plaintiffs assert the "Scheme" is unlawful *per se*. (Compl. ¶ 172.) But courts have repeatedly recognized that information exchanges are examined under the "rule of reason," in view of the procompetitive efficiencies of benchmarking—such as allowing businesses to identify where they are losing ground relative to competitors and where efficiency enhancing adjustments can be made. Plaintiffs cannot sidestep this fatal pleading defect.

Regardless, Plaintiffs' information-exchange allegations are deficient under any standard. Plaintiffs conflate the individual, vertical agreements that Defendants (and the alleged co-conspirators) have with Agri Stats to provide information and receive reports into a horizontal agreement between Defendants themselves. Yet they plead no factual support equating the two. This leaves them with allegations of a "rimless-wheel" conspiracy—which is no conspiracy at

all. Furthermore, even if reviewed under the rule of reason, this leg of the purported "Scheme" still collapses for additional reasons: Plaintiffs assert a *nationwide* relevant market that is contradicted by their own allegations of the fundamentally *localized* nature of Grower services, and they fail to plausibly allege that Grower pay fell below competitive levels in this (or any other) market.

In short, Plaintiffs fail to plead the basics of either alleged agreement; they plead half their case under the wrong legal standard; and they rely on conclusory assertions that conflict with other allegations. The law demands more.

## STATEMENT OF ALLEGED FACTS

Defendants[1] Koch and Sanderson Farms are two of at least 25 vertically integrated Broiler[2] chicken producers in the United States. (Compl. ¶¶ 19–41, 47 n.1, 52.) Their basic business model has been the same since the 1960s. (*Id.* ¶¶ 51–52.) Chicken producers operate in "localized networks of production" around the country. (*Id.* ¶ 47.) In order to ensure the quality and consistency of the chickens they sell to market, producers own feedmills that produce chicken feed, hatcheries where breeder chickens' eggs are hatched, and processing complexes where fully-grown Broilers are processed and chicken products are produced for sale. (*Id.* ¶¶ 49–56.) As part of this longstanding model, producers contract with Growers to feed and care for hatched Broiler chicks until they reach slaughtering age. (*Id.* ¶ 52.) Under this arrangement, producers provide chicks, feed, and veterinary services and supervise the Growers, including

---

[1] Koch Foods, Inc.; Koch Meat Co., Inc., d/b/a Koch Poultry Co. (collectively, "Koch"); Sanderson Farms, Inc.; Sanderson Farms, Inc. (Foods Division); Sanderson Farms, Inc. (Processing Division); and Sanderson Farms, Inc. (Production Division) (collectively, "Sanderson Farms").

[2] "Broilers" are "young chickens bred for meat," excluding "specialty chicken that is grown, processed, and sold according to, for example, halal, kosher, free range, pasture-raised, or organic standards." (Compl. ¶ 47 & n.1.)

specifying Growers' equipment to producers' individual, "precise" standards. (*Id.* ¶¶ 56–57.) Growers, in turn, provide labor, utilities, and up-front investment in facilities. (*Id.* ¶¶ 55–56.)

## A.    The Tournament System and Agri Stats

Chicken producers pay Growers pursuant to contracts, which typically specify a compensation formula. (*Id.* ¶¶ 47, 59.) Many producers pay Growers using a "Tournament System," which is an incentive-compensation arrangement that adjusts a producer's independently set "base pay" based on grow-out efficiency. (*Id.* ¶¶ 59, 151.) For a given producer, Growers who achieve above-average feed conversion (attaining more pounds of bird using less feed) earn more than the average base pay, and Growers who performed below average earn less. (*Id.* ¶¶ 153–54.)

The Tournament System has existed in some form since at least the mid-1970s and has remained a staple of the poultry industry because it rewards Grower efficiency and drives product quality that benefits consumers. Notably, the Tournament System is monitored by the Grain Inspection, Packers and Stockyards Administration (GIPSA), an agency of the U.S. Department of Agriculture, and the U.S. Department of Justice. *See, e.g.*, 9 C.F.R. § 201.3 (defining the scope of GIPSA's regulating authority to include "any poultry growing arrangement"); *id.* § 201.100 (mandating disclosure to Growers of "factors to be used when grouping or ranking poultry growers").

Additionally, and separately, many chicken producers subscribe to a third-party research firm called Agri Stats. Agri Stats is a subsidiary of Eli Lilly & Co. that, since 1985, has produced and sold benchmarking reports on various segments of the agricultural industry,

including the Broiler industry.[3] (Compl. ¶ 18.) Plaintiffs do not dispute that the data in Agri Stats reports is anonymous. (*Id.* ¶ 76.) They assert that, nonetheless, industry participants "can" use Agri Stats to identify specific producers' data. (*Id.*) Plaintiffs offer no specific factual allegations to support this conclusion.

In short, both the Tournament System and benchmarking through Agri Stats have been efficiency-enhancing features of the Broiler industry for decades. As set forth below, Plaintiffs' efforts to cast these practices and their dissatisfaction with the Grower-producer relationship as part of an industry-wide "Cartel" fail.

### B. Procedural History

This case relates to a putative class action currently pending in the U.S. District Court for the Eastern District of Oklahoma. There, the same Plaintiffs filed a complaint on behalf of the same proposed nationwide class of Growers against Koch, Sanderson Farms, and three other chicken producers: Perdue, Pilgrim's Pride, and Tyson. *See* Exs. A–B, *In re Broiler Chicken Grower Litigation*, No. 6:17-CV-033-RJS, Dkts. 2, 137 (E.D. Okla. 2017). The Oklahoma complaint identifies the same two alleged agreements supporting a conspiracy (no-poach and information sharing), alleges the same co-conspirators are part of that conspiracy, and asserts the same two claims (violations of Section 1 of the Sherman Antitrust Act and the Packers and Stockyards Act).

All of the defendants moved to dismiss under Rule 12(b)(6); Koch and Sanderson Farms also moved to dismiss for lack of personal jurisdiction and improper venue. The Oklahoma district court granted Koch's and Sanderson Farms' motions. *See* Ex. C, *In re Broiler Chicken*

---

[3] *See* Agri Stats, Inc., *Company History*, available at http://www.agristats.com/history (last visited July 4, 2018); Agri Stats, Inc., *Partnership and Services*, available at http://www.agristats.com/partnership (last visited July 4, 2018) (company website quoted in the Complaint at ¶¶ 69, 71).

*Grower Litigation*, No. 6:17-CV-033-RJS, Dkt. 217.  In doing so, the judge gave Plaintiffs 14

days to carefully consider how to proceed.  *See* Ex. D, Hr'g Tr. at 132:17–24.[4]  Plaintiffs could

either (1) file a motion to voluntarily dismiss the Oklahoma action and refile against all

defendants in an appropriate forum, or (2) proceed against the three remaining defendants in

Oklahoma, whose motion to dismiss remains pending.  *Id.* at 132:21–24.  In response, Plaintiffs'

counsel asked: "if we were to file other complaints in other jurisdictions and thereby triggering

[sic] an MDL, how should we address that in our 14 days?"  *Id.* at 134:3–5.)  Judge Shelby

replied: "I don't express any judgment about any of that or how any of that would be decided."

*Id.* at 134:19–20.  Plaintiffs attempted to create a MDL, but, as the Court is aware, the JPML

denied consolidation.  (Dkt 40.)  Thus, this Court is left with the later-filed case of two nearly

identical lawsuits.

## <u>ARGUMENT</u>

The rubric for assessing antitrust conspiracy claims under Section 1 of the Sherman

Antitrust Act is well established.  The crux of any conspiracy claim is *an agreement*.  To plead

one, Plaintiffs cannot simply assert that an agreement existed among Defendants and a host of

co-conspirators.[5]  *SD3*, 801 F.3d at 422–23.  Nor can they eschew pleading factual allegations

against *each defendant* in favor of "indeterminate assertions" against a vague collective.  *Id.* at

422.  Rather, Plaintiffs must plead "enough factual matter (taken as true) to suggest that an

---

[4] The Court can properly take judicial notice of the hearing transcript.  *See, e.g.*, *In re Garlock Sealing Techs. LLC*, 2017 WL 2539412, at *3 (W.D.N.C. June 12, 2017).

[5] The alleged co-conspirators include Agri Stats and 17 other corporate-family chicken producers:  Tyson, Pilgrim's Pride, Perdue, Foster Farms, Mountaire Farms, Wayne Farms, George's, Peco Foods, House of Raeford Farms, Simmons Foods, Keystone Foods, Fieldale Farms, O.K. Industries, Case Foods, Marshall Durbin Companies, Amick Farms, and Claxton Poultry Farms.  (Compl. ¶¶ 18–41.)

agreement was made." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  Plaintiffs do not meet that burden with respect to any part of the alleged "Scheme."

## I. Plaintiffs Have Failed to Allege an Agreement by Defendants Not to Poach Each Other's Growers.

Plaintiffs assert that Defendants and their alleged co-conspirators agreed not to "poach" Growers, but they do not (and cannot) plead a plausible agreement to this end.  The most basic way for Plaintiffs to plead such a conspiracy is with direct evidence, which is "extremely rare in antitrust cases and is usually referred to as the 'smoking gun.'" *Am. Chiropractic Ass'n v. Trigon Healthcare, Inc.*, 367 F.3d 212, 226 (4th Cir. 2004) (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159 (3d Cir. 2003)).  Short of that, Plaintiffs may alternatively plead circumstantial evidence that allows such an agreement to be inferred—*i.e.*, parallel conduct and "plus factors" that make it plausible that the parallel actions were deliberately taken in furtherance of an agreement.  *SD3*, 801 F.3d at 424.  Plaintiffs sufficiently plead neither.  Moreover, Plaintiffs concede that there are rational and competitive reasons behind Growers' infrequent switching.  This "obvious alternative explanation" for the conduct alleged precludes an inference of conspiracy.  *Twombly*, 550 U.S. at 567.

### A. Plaintiffs Do Not Plead Direct Evidence of a No-Poach Conspiracy.

Plaintiffs' "no poaching" claim rests on statements from unidentified Growers who provide their personal, unsubstantiated impressions of an agreement among producers.  (*See* Compl. ¶ 87 ("[I]t *seems* to be a written [sic] rule that if you go grow for one company, you really don't have the opportunity to even cross those lines to go to another company." (emphasis added)); *see also id.* ¶¶ 85–86, 88 (similar conclusory statements speculating, *inter alia*, as to the existence of an "unwritten pact").)  These statements, which do not even mention Defendants or purport to reflect personal knowledge, are not direct evidence of conspiracy—or evidence at all.

*See Am. Chiropractic*, 367 F.3d at 226 (explaining that direct evidence must be evidence that is "explicit and requires no inferences to establish the proposition or conclusion being asserted").

Nor is Plaintiffs' excerpt from a years-old complaint letter sent to GIPSA by an unnamed Tyson Grower about another non-Defendant, Peco Foods. The snippet claims that, at some unspecified time, an unnamed Peco secretary told the Grower that certain unidentified "companies" had an agreement not to take each other's Growers. (Compl. ¶ 84.) This too does not qualify as direct evidence in any sense. *See, e.g.*, *Superior Offshore Int'l, Inc. v. Bristow Grp. Inc.*, 738 F. Supp. 2d 505, 512–13 (D. Del. 2010) (holding that a statement reportedly made by a defendant's unidentified "operator" that "everyone more or less agreed" to a rate hike was not direct evidence of an agreement). Plaintiffs do not allege with whom Peco conspired, for what geographic region, or how long the agreement was to stay in place. Nor do they allege that the secretary was knowledgeable about the issues on which she purportedly spoke or was authorized to speak on behalf of Peco or the supposed conspirators (whomever those "companies" were). In any event, neither Tyson nor Peco are named defendants in this action, and neither Koch nor Sanderson Farms are directly implicated by the statement. Plaintiffs have no direct case. *See Am. Chiropractic*, 367 F.3d at 227 (rejecting as direct evidence allegations that required a "large inferential leap" that defendant "implemented the [challenged] policies only after reaching an agreement").

### B.  Plaintiffs Fail to Allege Circumstantial Evidence of a Plausible Conspiracy.

Plaintiffs also fail to plead a circumstantial case. Specifically, Plaintiffs have not adequately alleged (1) parallel conduct, (2) without alternative explanation, and (3) "plus factors" as they must to support an inference that a plausible "no poaching" agreement exists. *See SD3*, 801 F.3d at 424 ("[P]arallel conduct, standing alone, does not establish the required

agreement because it is equally consistent with lawful conduct. . . . For a § 1 claim to survive . . . a plaintiff must plead parallel conduct *and* something 'more.'"); *Twombly*, 550 U.S. at 567.

### 1. Plaintiffs Have Not Alleged Parallel Conduct

Plaintiffs do not sufficiently allege that Defendants, in parallel, declined to poach each other's Growers. Instead, they concede the opposite: 2.88% of Growers actually switched producers and about 5% of Growers were able to switch in 2014. (Compl. ¶¶ 89–91; *see also id.* ¶ 92 (admitting that Growers do switch producers, *e.g.*, when a producer has "too many Growers under contract").) More damningly, Plaintiffs fail to allege, as they must, a parallel *change* in Defendants' hiring patterns circa 2008 (when the conspiracy allegedly began) to plausibly suggest conspiracy. *See Twombly*, 550 U.S. at 556 n.4 (parallel-conduct allegations fail absent, *e.g.*, "complex and historically unprecedented changes in [behavior] made at the very same time by multiple competitors"). Plaintiffs do not allege that Growers previously moved between producers more freely or frequently. (*Cf.* Compl. ¶ 86 (perceptions of low switching existed as early as 1995).) Nor do they plead any contemporaneous drop in switching rates across producers. Indeed, other than alleging that Growers do not switch much, Plaintiffs do not plead anything that suggests the alleged conspirators' conduct with respect to Grower hiring is parallel at all.

Plaintiffs' circumstantial allegations thus fail for similar reasons as in *In re LTL Shipping Services Antitrust Litigation*: Defendants' hiring practices are "not alleged to be either historically unprecedented or enacted at the same time;" Defendants are alleged to have used similar practices "for decades;" and the only "factual data" pled in support of a "unified front"

against Grower poaching is from "[six] years" into the conspiracy period. 2009 WL 323219, at *17 (N.D. Ga. Jan. 28, 2009).[6]

Most striking, the Complaint includes no description of *Koch's* and *Sanderson Farms'* hiring conduct whatsoever, let alone whether it was in any way parallel. In fact, there is no allegation that Defendants declined to contract with any competitor's Grower. This failure to allege the bare minimum of parallel conduct is fatal. As the Fourth Circuit recently explained, "[a] plaintiff in a § 1 case cannot assemble some collection of defendants and then make vague, non-specific allegations against all of them as a group." *SD3*, 801 F.3d at 422. The reason is straightforward: "At trial, a § 1 plaintiff will be required to make a factual showing that *each defendant* conspired in violation of the antitrust laws," and "the complaint must forecast that factual showing." *Id.* (emphasis added, quotation omitted). Plaintiffs do not even attempt to do so with respect to Defendants. Because Plaintiffs fail to "specify how these defendants [were] involved in the alleged conspiracy without relying on indeterminate assertions against all 'defendants'"—or, here, all members of some amorphous "Cartel," (Compl. ¶ 89)—these "defendant[s] must be dismissed." *Id.* (quotation omitted); *see also Turner v. Virginia Dep't of Med. Assistance Servs.*, 230 F. Supp. 3d 498, 508–11 (W.D. Va. 2017) (dismissing complaint that "rest[ed] upon speculation and conclusory statements" of each defendant's membership in alleged conspiracy). That decides this case.

---

[6] Plaintiffs' alleged conspiracy is also implausible because they do not allege how Defendants and any co-conspirators might enforce the "no poaching" agreement. This failure is critical, as "a cartel cannot survive absent some enforcement mechanism because otherwise the incentives to cheat are too great." *Kleen Prod. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017). For instance, Plaintiffs do not plead what disincents a conspiring producer from hiring Growers from a competing producer when it would otherwise be independently rational to do so. Nor do they plead what "punishment," if any, was levied upon those producers who contracted with those Growers who did switch from competing producers. Without such allegations, no inference of an agreement arises.

2. **Plaintiffs Have Not Sufficiently Alleged That Any Parallel Conduct Was the Result of a Plausible Agreement.**

a. **Plaintiffs Plead Obvious, Alternative Explanations for Low Rates of Growers Switching Producers.**

Plaintiffs' circumstantial case fails for another reason: any "parallel" refusals by Defendants to hire Growers from other producers would just as likely be the result of "chance, coincidence, independent responses to common stimuli, or mere interdependence." *Twombly*, 550 U.S. at 556 n.4. Stated differently, parallel conduct does not support an inference of conspiracy where there is an "obvious alternative explanation" for it. *Id.* at 567. The Complaint itself pleads such explanations here.

*First*, Plaintiffs' allegations of producers' reluctance to hire outside Growers reflect *independently rational* conduct. Plaintiffs allege that producers have "precise specifications" for their Growers' houses and equipment. (Compl. ¶ 57.) Producers may rationally be hesitant to hire Growers who worked with other producers under different housing specifications. This makes sense given that, as Plaintiffs also plead, "[a] single grow-out house can cost $300,000 or more" (*id.* ¶ 61), Growers had an "average of 3.6 grow-out houses" as of 1999 (*id.* ¶ 98), and Growers become "laden with debt from building or upgrading the grow-out facilities" (*id.* ¶ 62). Thus, Plaintiffs plead themselves into conceding that the "natural explanation" for the noncompetition alleged is that Defendants each "liked the world the way it was" and "were sitting tight." *Twombly*, 550 U.S. at 568.

*Second*, Plaintiffs' allegations demonstrate that Growers also have their own independent interests in "sitting tight." Growers invest heavily in facilities specific to the producer with whom they have contracted. (Compl. ¶¶ 57–58.) Further, a considerable number of Growers do not have more than one chicken producer in their geographic area; for them, switching would require "moving." (*Id.* ¶ 93.) Given these investments, costs, and geographic constraints, the

low switching alleged is entirely predictable and comports with common sense. In short, Plaintiffs admit that Growers' low rate of switching is perfectly consistent with their unilateral self-interest, which means they have not pled a plausible agreement.

### b. Plaintiffs Have Not Alleged "Plus Factors" That Support an Inference of Conspiracy.

Even where antitrust plaintiffs adequately plead parallel conduct (which Plaintiffs have not), they also must plead "plus factors"—"further circumstance[s] pointing towards a meeting of the minds." *Twombly*, 550 U.S. at 557. Potential "plus factors" include "'motive to conspire,' 'opportunity to conspire,' 'high level of inter-firm communications,' irrational acts or acts contrary to a defendant's economic interest, but rational if the alleged agreement existed, and departure from normal business practices." *Merck-Medco Managed Care, LLC v. Rite Aid Corp.*, 201 F.3d 436 (4th Cir. 1999). The handful of "plus factors" Plaintiffs attempt to plead— (1) opportunities to conspire, (2) executives' mobility, and (3) industry characteristics—do not, taken together or separately, make their "no poaching" agreement even remotely plausible.

*First*, Plaintiffs' allegations that Defendants participate in trade association meetings, such as the National Chicken Council, are not enough. (Compl. ¶¶ 106–27.) "[I]t was well-settled [even] before *Twombly* that participation in trade organizations provides no indications of conspiracy." *Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1295–96 (11th Cir. 2010). Rather, Plaintiffs must advance specific allegations that an unlawful agreement was reached at these meetings. *See Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652, 664 (E.D.N.C. 2003). Plaintiffs include no such allegation. To the contrary, far from alleging facts connecting any trade association meetings with some shift in "poaching" behavior around 2008—the supposed origin point of the alleged conspiracy—the Complaint only offers a cursory recital of meetings that took place *years later*, beginning in 2011. (Compl. ¶¶ 119–25.)

Plaintiffs fare no better with their discussions of feedmill cross-testing and plant tours. (Compl. ¶¶ 80–81 (alleging "Chicken Media Summit" tours in 2013 and 2015—well after the alleged conspiracy's purported inception-date); *id.* ¶ 127.) Plaintiffs do not explain how these alleged activities further any conspiracy: asserting an "opportunity to conspire among senior executives" (*id.* ¶ 127) says nothing about whether those executives actually reached an agreement. Nor do they demonstrate that producers' stated reason for these activities—to develop "superior" chicks and "maximize efficiency"—is pretext. (*Id.* ¶ 80.)

*Second*, Plaintiffs' allegations of occasional movement of "high level employees" between producers does not move the needle. (Compl. ¶ 82.) Plaintiffs neither allege that Defendants' own executives have so moved, nor connect any such movements to the alleged conspiracy. (*See id.*) And, in reality, it would be odd if executives with relevant industry experience were not sometimes recruited away by competitors. *See, e.g.*, *Credit Bureau Servs., Inc. v. Experian Info. Sols.*, 2012 WL 6102068, at *19 (S.D. Fla. Dec. 7, 2012) (holding that an allegation "that officers of each [defendant] were at other times officers of the other" is insufficient to suggest conspiracy).

*Third*, the remaining "plus factors" Plaintiffs allege are insufficient as well. They allege that various industry characteristics and a history of government scrutiny of the chicken business support an inference of an agreement here. (Compl. ¶¶ 95–105, 128–32.) However, these phenomena do not make a conspiracy plausible. *See, e.g.*, *White v. R.M. Packer Co., Inc.*, 635 F.3d 571, 580 (1st Cir. 2011) (industry structure alone "does nothing to explain whether the parallel pricing was achieved by agreement or mere interdependent decisions"); *Hall*, 296 F. Supp. 2d at 663 ("[T]here appears to be no case law . . . where 'history of collusion' is used as a plus factor courts consider in cases alleging illegal collusion in an oligopolistic market.").

\*     \*     \*

Taken together, Plaintiffs fail to allege either direct or circumstantial factual matter sufficient to support a plausible "no poach" agreement. This begins and ends with their failure to allege any, much less parallel, conduct by Koch and Sanderson Farms. But, further, the low rate of Grower switching that Plaintiffs challenge is entirely consistent with independent, rational behavior on the parts of both producers and Growers. None of the "plus factors" Plaintiffs invoke suggests otherwise. Consequently, the first leg of their alleged "Scheme" fails.

## II.     The Complaint Does Not Allege a Plausible Information-Exchange Conspiracy.

Plaintiffs assert a broad allegation that Defendants "illegally agreed to share detailed data on Grower compensation" with each other. (Compl. ¶ 2.) This is the second leg of Plaintiffs' alleged "Scheme," and it is as deficient as the first. As an initial and dispositive matter, Plaintiffs proceed under the wrong legal standard. (*See* Compl. ¶ 172 (alleging a "*per se* violation" of the Sherman Act).) It is well settled that information exchanges are addressed under the rule of reason and are not examined as antitrust violations *per se*. *See, e.g.*, *Todd v. Exxon Corp.*, 275 F.3d 191, 198–99 (2d Cir. 2001) (Sotomayor, J.). This defect alone compels dismissal.

Moreover, Plaintiffs fail to plead direct or circumstantial factual support for any such agreement regardless of the standard applied. And even if they had, they cannot satisfy the additional requirements of the rule of reason: Plaintiffs fail to plead (i) a plausible relevant market and (ii) an anticompetitive effect on that market.

### A.     Plaintiffs Cannot Plead a *Per Se* Antitrust Violation.

When assessing conduct under antitrust law, courts apply one of two standards: the rule of reason or the *per se* rule. Under the rule of reason—the "usual standard"—a challenged practice is unlawful only where it both harms competition and is not justified by countervailing procompetitive benefits. *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 882,

14

885 (2007). By contrast, the *per se* rule that Plaintiffs plead treats certain practices as "necessarily illegal" without any inquiry into the reasonableness of the practice. *Id.* at 886. That standard pertains only to a narrow class of cases, like agreements to fix prices or divide markets, in which the alleged restraint on trade "always or almost always tend[s] to restrict competition and decrease output," and has no application here. *Cont'l Airlines, Inc. v. United Airlines, Inc.*, 277 F.3d 499, 509 (4th Cir. 2002).

In the information exchange that Plaintiffs allege, Defendants each supplied information to Agri Stats, an independent "statistical research and analysis firm," which in turn provided each Defendant with anonymized market reports. (Compl. ¶ 69.) Third-party benchmarking services like those provided by Agri Stats have substantial *procompetitive* benefits: they "force[] companies to compare themselves with best-in-class companies, quantify differences in performance, explain these differences, and identify steps to catch up and surpass." Thomas M. Jorde & David J. Teece, *Rule of Reason Analysis of Horizontal Arrangements: Agreements Designed to Advance Innovation and Commercialize Technology*, 61 Antitrust L.J. 579, 596 (1993). Such services were not intended to be "suppress[ed]" by the Sherman Act, as they allow the "individual intelligence of those engaged in commerce" to benefit all engaged in the market. *Maple Flooring Mfrs.' Ass'n v. U.S.*, 268 U.S. 563, 583–84 (1925). Thus, the Supreme Court held in *Maple Flooring* that even if an information exchange may "stabilize prices or limit production through a better understanding of economic laws and a more general ability to conform to them . . . the Sherman Law neither repeals economic laws nor prohibits the gathering and dissemination of information." *Id.* In short, "the dissemination of price information is not itself a per se violation of the Sherman Act." *United States v. Citizens & S. Nat'l Bank*, 422 U.S. 86, 113 (1975). The rule of reason governs.

Plaintiffs cannot avoid application of this standard by asserting that the "Scheme" as a whole is "a *per se* violation of the Sherman Antitrust Act." (Compl. ¶ 172.) The mere pleading of an overarching conspiracy does not mean that Defendants "may be found *per se* liable for all manner of conduct which may otherwise singly be evaluated under the rule of reason." *See In re Processed Eggs Prods. Antitrust Litig.*, 206 F. Supp. 3d 1033, 1040 (E.D. Pa. 2016). In *Processed Eggs*, for instance, the plaintiffs argued that an industry certification program served "a single, overarching conspiracy" to reduce egg supply. *Id.* They further argued that, since supply-reduction conspiracies are illegal *per se*, that standard applied to the certification program because "collective actions in furtherance of the conspiracy must be viewed as a singular attempt by the defendants to artificially reduce egg supply." *Id.* The court rejected this notion as one that "*cannot possibly be correct.*" *Id.* (emphasis added). Permitting such an end-run "would completely subsume the rule of reason in most, if not all circumstances." *Id.* Plaintiffs attempt to do just that.

Plaintiffs' Complaint alleges only a *per se* claim. Because the law precludes a *per se* challenge to an agreement to exchange information, Plaintiffs' pleading defect compels dismissal as a matter of law. *See In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 317 (3d Cir. 2010) ("If the court determines that the restraint at issue is sufficiently different from the per se archetypes to require application of the rule of reason, the plaintiff's claims will be dismissed."); *United States v. eBay, Inc.*, 968 F. Supp. 2d 1030, 1037–38 (N.D. Cal. 2013) ("[Plaintiff] must abide by the consequences of its pleading decisions. Should the court ultimately find that the [plaintiff] cannot maintain a per se or quick look claim, [it] will then be without recourse to the rule of reason and its case will be dismissed." (citing cases)).

**B.** **Plaintiffs Fail to Allege an Information Sharing Agreement Between Defendants Regardless of the Standard Applied.**

Regardless of the standard applied, Plaintiffs must allege an agreement in the first place. *See Burch v. Milberg Factors, Inc.*, 662 F.3d 212, 223 (3d Cir. 2011) ("[T]he exchange of price information still requires showing that the defendants had an agreement."). But they do not (and cannot) allege an agreement among Defendants to share information. As with the alleged "no poaching" agreement, Plaintiffs do not plead an agreement directly, nor do they adduce facts to support an inference that one existed. At bottom, their allegations reduce to the claim that each Defendant submits information to a benchmarking service—a long-standing practice that is perfectly legal.

**1.** **Plaintiffs Do Not Plead An Agreement *Between Defendants* to Exchange Information.**

Plaintiffs do not allege that Defendants (or the alleged co-conspirators) actually agreed among themselves to exchange information, as opposed to each producer deciding unilaterally to participate in benchmarking. They plead no direct evidence, and their circumstantial case boils down to (i) allegations that Defendants and others exchange various data with Agri Stats and (ii) the conclusion that they must also have agreed with each other to do so. (Compl. ¶¶ 68–78). But Plaintiffs plead no facts to support such a leap.

In other words, Plaintiffs have a "rimless wheel" problem. Plaintiffs assert that each Defendant, and 17 alleged co-conspirators, sends and receives weekly data to and from *Agri Stats* (making up the "spokes" of the wheel). (Compl. ¶¶ 19–41, 70–75.) But they do not allege how this conduct establishes a horizontal agreement *among Defendants* to do so (the missing "rim" of the wheel). Hence, Plaintiffs' rimless wheel:



In a horizontal conspiracy case, the "rim" is not optional. As the Fourth Circuit has explained, "[a] rimless wheel conspiracy is one in which various defendants enter into separate agreements with a common defendant, but where the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002). While such an arrangement may constitute "multiple [vertical] conspiracies between the common defendant and each of the other defendants," "*a wheel without a rim is not a single conspiracy*." *Id.* at 203–04 (emphasis added) (rejecting plaintiff software manufacturer's argument that licensing and distribution agreements between Microsoft and three original equipment manufacturers (OEMs) established a conspiracy among the OEMs); *see also Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1066 (D. Md. 1991) ("[Plaintiff] asserts . . . that 'an antitrust conspiracy may consist of a hub and spokes without a rim.' This is an incorrect statement of the law." (citation omitted)).

Here, Plaintiffs allege no facts establishing a "rim." They do not allege any communications between Defendants relating to Agri Stats. Nor do they allege any details about what information Defendants supposedly agreed among themselves to provide to and receive from Agri Stats. Instead, Plaintiffs obliquely catalogue the types of information Agri Stats

18

collects and the format in which the data is allegedly compiled (Compl. ¶¶ 72–75) and ask the Court to infer that Defendants must have agreed with each other to share that data and to limit competition among themselves. No such inference can be drawn: "the rim holding everything together is missing." *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 435–36 (6th Cir. 2008) (affirming dismissal because "the critical issue for establishing a . . . violation with the hub and spoke system is how the spokes are connected to each other").

In sum, other than alleging that Defendants use Agri Stats, Plaintiffs provide no facts to support an inference of any horizontal agreement. At most, they allege separate decisions by Defendants to subscribe to Agri Stats. *See, e.g.*, *Stand Energy Corp. v. Columbia Gas Transmission Corp.*, 521 F. Supp. 2d 537, 540 (S.D. W. Va. 2007) (dismissing horizontal-conspiracy claims where complaint described unlawful transactions between defendant pipelines and defendant shippers but did not "state facts which if true establish an agreement *among or between the shippers*, an essential element of a horizontal conspiracy claim" (emphasis added)). As a matter of law, Plaintiffs' allegations are insufficient to state an information-exchange agreement between Defendants.

### 2. There Is an Obvious, Alternative Explanation for Defendants' Participation in Agri Stats.

Similar to the "no poach" agreement allegations, there is an obvious, alternative explanation for Defendants' participation in Agri Stats that precludes Plaintiffs' claims. *See Twombly*, 550 U.S. at 567. As discussed above, information exchanges help companies *compete. See supra* Part II.A. Participating in benchmarking is independent, rational behavior at odds with conspiracy. *See SD3*, 801 F.3d at 424 (complaint insufficient if alleged behavior "could be just as easily explained by 'natural, unilateral reaction[s]' from each defendant").

Moreover, this is true even if, as Plaintiffs allege, Defendants use Agri Stats to "monitor each other's compensation levels to Growers." (Compl. ¶ 77.) It makes unilateral sense that each Defendant would do so to determine whether it is paying a competitive price for Grower services. *Superior Offshore International, Inc. v. Bristow Group Inc.* is instructive on this point. In that case, the court dismissed a Sherman Act claim where "[d]efendants openly shared information about their capacity to serve . . . oil and gas producers, and the costs [d]efendants commonly faced for fuel, helicopters, support facilities, personnel, and maintenance." 738 F. Supp. 2d at 516. The court emphasized that, even if supported with adequate factual matter, "[s]uch exchanges among rivals 'can in certain circumstances increase economic efficiency and render markets more, rather than less, competitive.'" *Id.* (quotation omitted). Consequently, "Defendants' alleged knowledge of their co-competitors' cost structures, and the competitors' unfettered exchange of business information, [were] neither remarkable nor actionable." *Id.* (quotation omitted).

The same is true here. Exchanging information through Agri Stats, including information about Growers compensation (*see* Compl. ¶ 70), is entirely consistent with independent business decisions. *See Superior Offshore*, 738 F. Supp. 2d at 516. Plaintiffs plead no facts supporting their alternative conclusion that Defendants monitor Grower compensation to "ensure that no [producer] is offering materially more in compensation than another." (Compl. ¶ 77.) Nor do they plead how that outcome obtains or could be enforced—*i.e.*, what would purportedly happen if a Defendant did offer more. *See Kleen Prod. LLC v. Int'l Paper*, 276 F. Supp. 3d 811, 842 (N.D. Ill. 2017) ("A punishment mechanism is crucial [because] it helps to distinguish illicit express collusion from lawful tacit collusion. . . . With no punishment, or even a mechanism to punish, the inference tends toward no agreement."). Given the absence of any such alleged

"punishment mechanisms," Plaintiffs' allegation that Defendants use Agri Stats to monitor each other's Grower pay is, at best for Plaintiffs, as consistent with the intelligent business operations that the Sherman Act protects. *See Maple Flooring*, 268 U.S. at 583–84. That is not enough to make an agreement plausible. *See Twombly*, 550 U.S. at 557 (requiring at the pleading stage "allegations plausibly suggesting (not merely consistent with) agreement").

### 3. Plaintiffs Do Not Sufficiently Plead "Plus Factors."

Plaintiffs' circumstantial case fails for the additional reason that they do not plead meaningful plus factors. For example, Plaintiffs' allegations of opportunities to conspire at trade association meetings and through feedmill cross-testing and complex tours (Compl. ¶¶ 76–77, 103–23), as well as their allegations that executives sometimes switch companies (*id.* ¶ 78), remain insufficient as a matter of law. *See supra* Part I.B.2.b. Plaintiffs do not connect these allegations with Defendants' supposed agreement to share information through Agri Stats.

To the contrary, Plaintiffs' allegations conflict and render any motive to collude implausible. If Plaintiffs' first alleged agreement existed, and Growers had nowhere to go due to industry-wide poaching restrictions (Compl. ¶ 83), then Defendants had no motive to enter the second alleged agreement to submit information so that they may "constantly monitor" what other producers are paying (*id.* ¶ 77). Simply put, Plaintiffs cannot carry their burden to allege that Defendants had "a conscious commitment to a common scheme designed to achieve an unlawful objective" as they must to plead agreement. *Monsanto Co. v. Spray-Rite Serv. Corp.*, 465 U.S. 752, 768 (1984). Their claims must fail.

### C. Plaintiffs Cannot Maintain a Claim Under the Rule of Reason Because They Have Not Pled Anticompetitive Effects in a Plausible Geographic Market.

Setting aside Plaintiffs' pleading defect (pursuit of a *per se* case) and failure to allege an agreement, they also cannot state a claim that any agreement would contravene the rule of

reason. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018). This requires (1) defining a relevant product and geographic market in which the alleged conspirators had market power and (2) showing that "the conspiracy produced adverse, anti-competitive effects within the relevant product and geographic market." *SD3*, 801 F.3d at 432. Plaintiffs' information-exchange allegations are deficient on both fronts.

### 1. Plaintiffs Fail to Allege a Plausible Geographic Market.

Defining the relevant market is at the heart of rule-of-reason analysis. The rule of reason is "an inquiry into market power and market structure designed to assess [a conspiracy's] actual effect." *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 768 (1984) (citations omitted). Accordingly, as the Fourth Circuit has explained, "a plaintiff must prove what market . . . was restrained and that the defendants played a significant role in the relevant market because [a]bsent this market power, any restraint on trade created by defendants' action is unlikely to implicate Section 1." *Cont'l Airlines*, 277 F.3d at 509 (alterations in original, quotations omitted). In short, to state a claim under the rule of reason Plaintiffs "must allege that [Defendants'] actions unreasonably restrained trade in a *plausible* market." *K-Flex, Inc. v. Armacell, Inc.*, 299 F. Supp. 3d 730, 734 (W.D.N.C. 2017) (emphasis added) (citing *Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 190 (2010)); *see also Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 52–53 (2d Cir. 2016) ("To survive a motion to dismiss, a Sherman Act claim must . . . define the relevant geographic market" and plead "sufficient facts to allege plausibly the existence of both a product and geographic market."). They have not done so.

Here, Plaintiffs allege a *buyer-side* conspiracy on the premise that "the relevant [product] market is the *purchase* of Broiler Grow-Out Services." (Compl. ¶ 133 (emphasis added).)  This means that, to be plausible, the relevant geographic market must be limited to an area "comprised of buyers [of such services, *i.e.*, the alleged conspirators] who are seen by sellers [*i.e.*, Growers] as being reasonably good substitutes." *Todd*, 275 F.3d at 202.  Put another way, Plaintiffs must allege "the narrowest market which is wide enough so that [purchasers of Grower services] from adjacent areas . . . cannot compete on substantial parity with those included in the market." *Seabury Mgmt., Inc. v. Prof'l Golfers' Ass'n of Am., Inc.*, 52 F.3d 322 (4th Cir. 1995).

Plaintiffs have not met this threshold pleading requirement.  To be sure, Plaintiffs assert that the "relevant geographic market is the United States." (Compl. ¶ 133.)  But this statement not only lacks any supporting factual allegations, it is also contradicted by Plaintiffs' own allegations and common sense.  Specifically, the facts in the Complaint establish that the market for Grower services is inherently local in nature.  For example, Plaintiffs plead that "Broiler production is *concentrated into localized networks of production* dominated by vertically integrated poultry companies." (*Id.* ¶ 47 (emphasis added).)  They allege that "[e]ach Integrator in *a given location* uses the so-called Tournament System" and that "Integrators rank each Grower in *a given region* against each other" to determine pay.  (*Id.* ¶ 151 (emphasis added).)  And they concede that Growers cannot possibly (much less plausibly) view producers whose complexes are located hundreds of miles away as "reasonably good substitutes" for those situated in close proximity to the Growers' operations (or vice versa).  (*E.g.*, *id.* ¶ 93 (alleging that in 2012 "over three-quarters of Growers ha[d] more than one Integrator in their geographic area," such that *those* Growers "could, in theory, switch Integrators"); ¶ 145 (alleging that the 'no poach' agreement directly suppresses competition for Broiler Grow-Out Services *in areas*

*with more than one Integrator*" (emphasis added)).)  Hence, Plaintiffs' own allegations demonstrate that the Complaint's nationwide market definition is "fatally overbroad," as it "advances no credible allegation" that Growers sell, or Defendants compete for, grow-out services on a national level. *Drake v. Cox Comm., Inc.*, 2011 WL 2680688, at \*3 (D. Kan. July 8, 2011).[7]

Where, as here, a plausible market is not adequately pled under the rule of reason, the claim must be dismissed. *See, e.g.*, *id.* (granting motion to dismiss); *Uretek USA, Inc. v. Applied Polymerics, Inc.*, 2011 WL 6029964, at \*5 (E.D. Va. Dec. 5, 2011) (granting motion to dismiss antitrust counterclaim because the assertion that "the relevant product market is the pavement lifting and roadway repair and maintenance industries, and the relevant geographic market is the United States . . . is too broad and is unsupported by factual allegations"); *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, at \*10–11 (W.D. Va. May 28, 2015) (dismissing complaint alleging that defendants conspired to restrain competition for each other's employees based on the "implausible . . . relevant geographic market proposed by plaintiffs" that was "utterly unrealistic" and "made 'no economic sense'"); *Crain v. Debartolo*, 2015 WL 73961, at \*8 (E.D.N.C. Jan. 6, 2015) (dismissing complaint for failure "to allege a relevant product or geographic market in which [alleged] harm might occur").[8]  In sum, Plaintiffs have merely

---

[7] Indeed, another district court in the Fourth Circuit has recognized the fundamentally localized nature of Grower services. *See M & M Poultry, Inc. v. Pilgrim's Pride Corp.*, 281 F. Supp. 3d 610, 619 (N.D. W. Va. 2017) ("The economic feasibility of poultry integrators or other producers to contract with grower farms is largely determined by the distance between grower farms and the producer's facilities. . . . Pilgrim's generally contracts with broiler growers whose farms are no more than fifty miles from its feed mills or processing plants.").

[8] *See also It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676, 682 (4th Cir. 2016) (rejecting plaintiff's proposed national relevant geographic market for concert promotion as being "blind to the basic economics of concert promotion" because "promoting shows is highly localized, and . . . most promoters promote in specific locations").

posited an overbroad nationwide market without any factual allegations to support it—and, indeed, with many that flatly contradict it.

### 2. Plaintiffs Fail to Allege an Anticompetitive Effect on Grower Pay.

Plaintiffs' allegations are further deficient under the rule of reason because the Complaint does not allege a single fact connecting Defendants' use of Agri Stats to anticompetitively lower pay. That is, Plaintiffs fail to provide any detail alleging that Growers were compensated below "a competitive level." *Am. Express*, 138 S. Ct. at 2278. This, too, is determinative.

*First*, the Complaint largely rests on conclusory statements that Defendants' information exchange has "artificially reduced the compensation of all Growers below levels that would have prevailed in its absence." (Compl. ¶ 148; *see also id.* ¶¶ 2–3, 143.) These vague and conclusory statements fall far short of "rais[ing] the right to relief above the speculative level," *Twombly*, 550 U.S. at 555, and should be rejected out of hand.

*Second*, the Complaint refers to a "downward trend" in Grower pay dating back to "at least 2007" (or even "the 1980s") (Compl. ¶ 155), but offers no facts suggesting this trend has pushed compensation below competitive levels. *See, e.g.*, *Dickson*, 309 F.3d at 206 (explaining that a negative effect on a market participant is distinct from an injury to "competition itself"). What is more, the Complaint pleads nothing to suggest that this "trend" is related to an unlawful agreement entered into by Defendants. That is, Plaintiffs fail to dissociate any declines in Grower pay caused by general market trends from those supposedly caused by some subsequent conspiracy. *See In re Graphics Processing Units Antitrust Litig.*, 527 F. Supp. 2d 1011, 1024 (N.D. Cal. 2007) (granting motion to dismiss because "[a]lthough the complaints are replete with allegations about defendants' pricing behavior *after* the conspiracy allegedly began, they say next to nothing about defendants' pricing behavior *before* the conspiracy began").

*Third*, the Complaint's attempt to bootstrap an anticompetitive effect onto the GIPSA-monitored "Tournament System" fares no better. (Compl. ¶¶ 150–54.) Plaintiffs plead that the Tournament System's offense is "pegg[ing]" Grower compensation to the allegedly "suppressed base pay amount," using base pay as the amount above, at, or below which Growers competing against each other are paid. (*Id.* ¶¶ 152–54.) They all but concede, however, that the Tournament System has nothing to do with *setting* (and, thus, suppressing) base pay. (*Id.*); *see also Tigard Elec., Inc. v. Nat'l Elec. Contractors Ass'n*, 790 F. Supp. 1498, 1501–03 (D. Or. 1992) (granting motion to dismiss where plaintiffs failed to provide specific allegations supporting their claim that defendants' information exchange through a job training program was used anticompetitively).

*Fourth*, Plaintiffs assert a ripple effect on Broiler supply and prices. (Compl. ¶ 149 (claiming that suppressed Grower pay leads to "reduce[d] Broiler output" and "artificially inflated prices").) But Plaintiffs plead no facts suggesting that what Growers are paid has anything to do with the *number* of Broilers they produce. (*Cf.* Compl. ¶ 54 (alleging that *producers* direct the "amount" of Broilers grown).) Thus, Plaintiffs plead no effect on output or market prices.

*        *        *

Defendants' information exchange through Agri Stats cannot be *per se* illegal. Plaintiffs have not alleged a plausible horizontal agreement regardless of the standard applied; and even when properly evaluated under the rule of reason, Plaintiffs claims remain insufficient. The Complaint pleads an implausible national market for a localized service and fails to allege any anticompetitive injury therein. Thus, the second putative agreement in Plaintiffs' alleged "Scheme" fails.

**III.    Plaintiffs' Packers and Stockyards Act Claim Must Also Be Dismissed.**

Without augmenting or supplementing their factual allegations, Plaintiffs also bring a claim under a statute specific to poultry and other meat dealers:  the Packers and Stockyards Act ("PSA").  However, courts have consistently recognized that PSA claims are analytically similar to Sherman Act claims because the PSA "incorporates the basic antitrust blueprint of the Sherman Act."  *Been v. O.K. Indus., Inc.*, 495 F.3d 1217, 1228 (10th Cir. 2007).  Because Plaintiffs' PSA claim merely repeats their Sherman Act allegations, it too must be dismissed.

Plaintiffs bring their PSA claim under the Act's provisions making it unlawful for "live poultry dealer[s] with respect to live poultry" to:  (1) "[e]ngage in or use any unfair, unjustly discriminatory, or deceptive practice or device," 7 U.S.C. § 192(a), or (2) "[c]onspire" to do the same or to "manipulate or control prices," *id.* § 192(f)(3), (g).  (Compl. ¶¶ 175–77.)  Because Plaintiffs fail to plead any anticompetitive agreement under the Sherman Act, as discussed above, their PSA conspiracy claims under Sections 192(f)(3) and (g) must be dismissed.

Plaintiffs' claim under Section 192(a) demands the same result.  Plaintiffs cannot sustain a cause of action under that provision unless they adequately plead an "adverse[]" effect on competition.  *Philson v. Goldsboro Mill. Co.*, 164 F.3d 625 (4th Cir. 1998) (unpublished).[9]  As stated, they have not done so against any producer.  Indeed, given that § 192(a) is not a conspiracy provision—it applies to poultry dealers individually—the Complaint's failure to allege any anticompetitive practices by Koch or Sanderson Farms, specifically, comes into sharp focus.  Plaintiffs level broad-strokes accusations against the industry as a whole, with nary a

---

[9] *See also, e.g.*, *London v. Fieldale Farms, Inc.*, 410 F.3d 1295, 1303 (11th Cir. 2005) ("Relying upon the PSA's antitrust ancestry, several courts have held that only those unfair, discriminatory or deceptive practices adversely affecting competition are prohibited by the PSA."); *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 363 (5th Cir. 2009) (en banc) (same).

mention of Defendants sufficient to plausibly suggest that *they* (individually or together) engaged in any anticompetitive conduct. *See Twombly*, 550 U.S. at 555. This silence is dispositive.

## IV. The Complaint Alternatively Should Be Dismissed Under the First-Filed Rule.

Although the foregoing pleading deficiencies render the Complaint insufficient on its face, the Court should alternatively dismiss this case in favor of the earlier-filed Oklahoma action pursuant to the first-filed rule. When similar lawsuits are filed in multiple fora, "the first suit should have priority, absent the showing of balance of convenience in favor of the second action." *Volvo Constr. Equip. N. Am., Inc. v. CLM Equip. Co. Inc.,* 386 F.3d 581, 594–95 (4th Cir. 2004) (quotations omitted). In applying this rule, courts consider "(1) the chronology of the filings, (2) the similarity of the parties involved, and (3) the similarities of the issues being raised." *Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*, 2012 WL 1825331, at *4 (E.D.N.C. May 18, 2012) (citing cases). All three factors support the first-filed rule's application here.

The first factor is obviously met since the Oklahoma case was filed first. The second factor is satisfied because the same named class representatives filed suit on behalf of the same putative nationwide class in both lawsuits. *See Worthington v. Bayer Healthcare, LLC*, 2012 WL 1079716, at *7 (D.N.J. Mar. 30, 2012) (dismissing second-filed class action on first-filed grounds when both cases purported to represent the same nationwide class). And the third factor is met because the two actions assert the same claims based on the same alleged conspiratorial agreements.

With all three factors met, the Court is "require[d]" to dismiss or stay this duplicative case "in deference to the earlier-filed action." *St. Paul Fire & Marine Ins. Co. v. Renne Acquisitions Corp.*, 2010 WL 2465543, at *2 (W.D.N.C. June 14, 2010). Here, dismissal is superior to a stay because, if the Oklahoma action is dismissed, Plaintiffs should not be given a second bite at the apple by having this Court decide largely identical issues. *See, e.g.*, *U.S. ex*

*rel. Szymoniak v. ACE Sec. Corp.*, 2014 WL 1910876, at \*5–6 (D.S.C. May 12, 2014) (dismissing later-filed case alleging "same scheme" as first-filed action); *Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*, 2010 WL 11561770, at \*2 (E.D.N.C. Mar. 1, 2010) (Dever III, J.) (dismissing later-filed case "aris[ing] from the same set of facts" as first-filed case).

## CONCLUSION

For the foregoing reasons, the Court should dismiss Plaintiffs' Complaint with prejudice.

Date: July 13, 2018                            Respectfully submitted,

/s/ Daniel E. Laytin, P.C.
Daniel E. Laytin, P.C.
Illinois Bar No. 6257119
Christa C. Cottrell, P.C.
Illinois Bar No. 6284749
Martin L. Roth
Illinois Bar No. 6296464
Stacy Pepper
Illinois Bar No. 6306726
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000
dlaytin@kirkland.com
ccottrell@kirkland.com
martin.roth@kirkland.com
stacy.pepper@kirkland.com

*Counsel for Defendants Sanderson Farms, Inc.,
Sanderson Farms, Inc. (Foods Division),
Sanderson Farms, Inc. (Processing Division), and
Sanderson Farms, Inc. (Production Division)*

/s/ Erik R. Zimmerman
Gregory L. Skidmore
N.C. Bar No. 35571
Erik R. Zimmerman
N.C. Bar No. 50247
Robinson, Bradshaw & Hinson, P.A.
1450 Raleigh Road, Suite 100
Chapel Hill, NC 27517
(919) 328-8800
Fax: 919-328-8790
gskidmore@robinsonbradshaw.com
ezimmerman@robinsonbradshaw.com

*Local Civil Rule 83.1(d) Counsel for Defendants
Sanderson Farms, Inc., Sanderson Farms, Inc.
(Foods Division), Sanderson Farms, Inc.
(Processing Division), and Sanderson Farms, Inc.
(Production Division)*

/s/ Scott W. Pedigo
Cable M. Frost
Mississippi Bar No. 100757
Scott W. Pedigo
Mississippi Bar No. 10735
Samuel D. Gregory
Mississippi Bar No. 104563
Baker Donelson Bearman Caldwell & Berkowitz
100 Vision Dr., Suite 400
Jackson, MS 39211
(601) 351-2466
cfrost@bakerdonelson.com
spedigo@bakerdonelson.com
sdgregory@bakerdonelson.com

John G. Calender
D.C. Bar No. 939124
Baker Donelson Bearman Caldwell & Berkowitz
901 K Street NW, Suite 900
Washington, DC 20001
(202) 508-3474
Fax: (202) 220-2274
jcalender@bakerdonelson.com

Jessica L. Willson
N.C. Bar No. 52465
Matthew Nis Leerberg
N.C. Bar No. 35406
Smith Moore Leatherwood LLP
Post Office Box 27525
434 Fayetteville St., Suite 2800
Two Hannover Square
Raleigh, NC 27601
(919) 755-8763
Fax: (919) 838-3176
jess.green@smithmoorelaw.com
matt.leerberg@smithmoorelaw.com

*Counsel for Defendants Koch Foods, Inc. and
Koch Meat Co., Inc. (doing business as Koch
Poultry Co.)*

## CERTIFICATE OF SERVICE

On July 13, 2018, I electronically transmitted a true and correct copy of the foregoing document to the Clerk of Court for filing using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Erik R. Zimmerman
Erik R. Zimmerman
NC Bar No. 50247
Robinson, Bradshaw & Hinson, P.A.
1450 Raleigh Road, Suite 100
Chapel Hill, NC 27517
(919) 328-8800
Fax: (919) 328-8790
ezimmerman@robinsonbradshaw.com

*Local Civil Rule 83.1(d) Counsel for Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Processing Division), Sanderson Farms, Inc. (Production Division), & Sanderson Farms, Inc. (Foods Division)*