# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN RE: SANDERSON AND KOCH BROILER CHICKEN GROWER LITIGATION | Case No. 18-cv-031<br><br>**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' JOINT MOTION TO DISMISS UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)** |

# TABLE OF CONTENTS

I.    INTRODUCTION ............................................................................................................ 1

II.   BACKGROUND ............................................................................................................ 4

      A.    The Structure of the Grower-Integrator Relationship............................................ 4

      B.    The Grower Compensation System ........................................................................ 5

      C.    Defendants' Anticompetitive Conspiracy............................................................... 5

      D.    Additional Factors Rendering the Broiler Industry Conducive to Collusion ........ 7

III.  LEGAL STANDARD.................................................................................................... 7

IV.   ARGUMENT................................................................................................................. 8

      A.    Plaintiffs Sufficiently Plead an Anticompetitive Conspiracy in Violation of
            Section 1................................................................................................................... 8

            1.    Plaintiffs plead a single, overarching anticompetitive Conspiracy
                  consisting of two complementary and mutually reinforcing elements. ...... 8

            2.    Plaintiffs sufficiently plead a Section 1 violation arising from the ISA... 10

                  a.    The ISA allegations alone state a claim under the rule of reason. 10

                        i.     Defendants' agreement to participate in the Agri Stats
                               program is an unlawful horizontal agreement under Section
                               1...................................................................................................... 11

                        ii.    The information exchanged through the ISA is of the type
                               that has traditionally raised concern of anticompetitive
                               effects. ........................................................................................... 15

                        iii.   The structure of the market for Grow-Out Services renders
                               it susceptible to harm through information sharing by
                               would be competitors....................................................................... 16

                        iv.    Plaintiffs do not plead the ISA (in isolation) as a *per se*
                               claim................................................................................................ 17

            3.    Plaintiffs sufficiently plead a Section 1 violation arising out of the
                  NPA.......................................................................................................... 19

            4.    Plaintiffs allege relevant plus factors..................................................... 22

            5.    Plaintiffs allege a plausible relevant market and anticompetitive effects. 24

      B.    Defendants Misstate the Standards Governing Plaintiffs' Well-Pled PSA Claim 27

      C.    Defendants Improperly Invoke the First-Filed Rule ............................................ 29

V.    CONCLUSION............................................................................................................. 30

# TABLE OF AUTHORITIES

**Cases**                                                                                                            **Page(s)**

*Am. Column & Lumber Co. v. United States*,
    257 U.S. 377 (1921) ................................................................................................................ 11, 12, 15, 16-17

*American Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ................................................................................................ 23

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ................................................................................................................ 8

*Beach Mart, Inc. v. L & L Wings, Inc.*,
    No. 2:11-cv-44, 2014 WL 1365708 (E.D.N.C. Apr. 7, 2014) ................................................ 29, 30

*Been v. O.K. Industries, Inc.*,
    495 F.3d 1217 (10th Cir. 2007) ................................................................................................ 6-7

*Been v. O.K. Industries, Inc.*,
    98 Fed. Appx. 382 (10th Cir. 2010) ........................................................................................ 28

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ................................................................................................................ 8, 21, 27

*Berlyn, Inc. v. The Gazette Newspapers, Inc.*,
    157 F. Supp. 2d 609 (D. Md. 2001) ........................................................................................ 18

*B&R Supermarket, Inc. v. Visa, Inc.*,
    No. 16-cv-1150, 2016 WL 5725010 (N.D. Cal. Sept 30, 2016) ............................................ 23

*Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*,
    19 F. Supp. 2d 567 (N.D.W. Va. 1998) .................................................................................. 19

*Buffalo Wild Wings, Inc. v. BWR McAllen, Inc.*,
    No. 10-cv-1265, 2010 WL 26420122 (S.D. Tex. June 30, 2010) .......................................... 29

*Burtch v. Milberg Factors, Inc.*,
    662 F.3d 212 (3d Cir. 2011) .................................................................................................... 14

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
    370 U.S. 690 (1962) ................................................................................................................ 9

*DeLoach v. Philip Morris Companies, Inc.*,
    No. 1:00CV01235, 2001 WL 1301221 (M.D.N.C. July 24, 2001) ........................................ 8

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .................................................................................................. 12, 13

*Ellicott Mach. Corp. v. Modern Welding Co.*,
    502 F.2d 178 (4th Cir. 1974) .................................................................................................. 30

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*,
    637 F.3d 435 (4th Cir. 2011) .................................................................................................. 25

ii

*Evergreen Partnering Grp., Inc. v. Pactiv Corp.*,
   720 F.3d 33 (1st Cir. 2013) ........................................................................... 8

*Fed. Trade Comm'n v. Cardinal Health, Inc.*,
   12 F. Supp. 2d 34 (D.D.C. 1998) ............................................................... 25

*FTC v. Indiana Fed'n of Dentists*,
   476 U.S. 447 (1986) ..................................................................................... 26

*FTC v. Innovative Mktg.*,
   654 F. Supp. 2d 378 (D. Md. 2009) .............................................................. 8

*Gumwood HP Shopping Partners, L.P. v. Simon Prop. Grp., Inc.*,
   No. 3:11-CV-268 JD, 2016 WL 6091244 (N.D. Ind. Oct. 19, 2016) ................. 25

*Griffin v. Smithfield Foods, Inc.*,
   183 F. Supp. 2d 824 (E.D. Va. 2002) .......................................................... 27

*Hall v. United Air Lines, Inc.*,
   296 F. Supp. 2d 652 (E.D.N.C. 2003) ........................................................ 23

*Hanger v. Berkeley Group, Inc.*,
   No. 5:13–cv–113, 2015 WL 3439255 (W.D. Va. May 28, 2015) .................. 25-26

*Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*,
   No. 7:11-cv-187, 2012 WL 1825331 (E.D.N.C. May 18, 2012) ...................... 30

*Houck v. Substitute Tr. Servs.*,
   791 F.3d 473 (4th Cir. 2015) .......................................................................... 8

*In re Aggrenox Antitrust Litig.*,
   199 F. Supp. 3d 662 (D. Conn. 2016) ......................................................... 26

*In re Animation Workers Antitrust Litig.*,
   123 F. Supp. 3d 1175 (N.D. Cal. 2015) ................................... 9-10, 18, 20, 22

*In re Automotive Parts Antitrust Litig.*,
   29 F. Supp. 3d 982 (E.D. Mich. 2014) ..................................................... 20-21

*In re Cathode Ray Tube*,
   738 F. Supp. 2d 1011 (N.D. Cal. 2010) ....................................................... 22

*In re Dental Supplies Antitrust Litig.*,
   No. 16-cv-696, 2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ...................... 22

*In re eBay Seller Antitrust Litig.*,
   545 F. Supp. 2d 1027 (N.C. Cal. 2008) ...................................................... 19

*In re Flat Glass Antitrust Litig. (II)*,
   Nos. 8-180, 11-658, 2012 WL 5383346, (W.D. Pa. Nov. 1, 2012) .................. 9

*In re Fresh & Process Potatoes Antitrust Litig.*,
   834 F. Supp. 2d 1141 (D. Idaho 2011) ......................................................... 8

*In re High Tech Employee Antitrust Litig.*,
856 F. Supp. 2d 1103 (N.D. Cal. 2012) ............................................................ 9, 19, 22, 23

*In re Petroleum Prods. Antitrust Litig.*,
906 F.2d 432 (9th Cir. 1990) ......................................................................................... 9, 15

*In re Pool Prod. Distribution Mkt. Antitrust Litig.*,
940 F. Supp. 2d 367 (E.D. La. 2013) ..................................................................................... 25

*In re Se. Milk Antitrust Litig.*,
739 F.3d 262 (6th Cir. 2014) ................................................................................................... 24

*In re Static Random Access Memory (SRAM) Antitrust Litig.*,
580 F. Supp. 2d 896 (N.D. Cal. 2008) ........................................................................ 11-12, 22

*Interstate Circuit, Inc. v. United States*,
306 U.S. 208 (1939) ............................................................................................................... 13

*It's My Party, Inc. v. Live Nation, Inc.*,
811 F.3d 676 (4th Cir. 2016) ................................................................................................... 26

*Kamakahi v. Am. Soc. for Reprod. Med.*,
305 F.R.D. 164, 190 (N.D. Cal. 2015) ..................................................................................... 19

*Kamakahi v. Am. Soc'y for Reprod. Med.*,
No. C 11-01781 SBA, 2013 WL 1768706 (N.D. Cal. Mar. 29, 2013) ............................... 25

*K-Flex, Inc. v. Armacell, Inc.*,
299 F. Supp. 3d 730 (E.D.N.C. 2017) ................................................................................. 8, 24

*Linlor v. Polson*,
263 F. Supp. 3d 613 (E.D. Va. 2017) ..................................................................................... 19

*Maple Flooring Mfrs. v. United States*,
268 U.S. 563 (1925) ............................................................................................................... 19

*Merenda v. VHS of Michigan, Inc.*,
296 F.R.D. 528 (E.D. Mich. 2013) ......................................................................................... 19

*Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
18 F. Supp. 3d 662 (D. Md. 2013) ......................................................................................... 10

*Milliken & Co. v. CNA Holdings, Inc.*,
No. 3:08-CV-578, 2011 WL 3444013 (W.D.N.C. Aug. 8, 2011) .................................... 10, 27

*Mylan Labs., Inc. v. Akzo, N.V.*,
770 F. Supp. 1053 (D. Md. 1991) ........................................................................................... 13

*Nutrition & Fitness, Inc. v. Progressive Emu, Inc.*,
No. 5:12-cv-192, 2012 WL 2062299 (E.D.N.C. June 7, 2012*)* ........................................... 29

*Ohio v. American Express Co.*,
138 S. Ct. 2274 (2018) ............................................................................................................ 26

*Philson v. Cold Creek Farms, Inc.*,
    947 F. Supp. 197 (E.D.N.C. 1996) ................................................................................. 28

*Philson v. Goldsboro Mill Co.*,
    164 F.3d 625 (4th Cir. 1998) ...................................................................................... 28

*Precision Piping & Instruments, Inc. v. E. I. Du Pont de Nemours & Co.*,
    707 F. Supp. 225 (S.D. W. Va. 1989) ............................................................................ 8

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*,
    51 F.3d 1421 (9th Cir. 1995) ...................................................................................... 26

*Retrophin, Inc. v. Questcor Pharmaceuticals, Inc.*,
    41 F. Supp. 3d 906 (C.D. Cal. 2014) ............................................................................ 19

*Robertson v. Sea Pines Real Estate Companies, Inc.*,
    679 F.3d 278 (4th Cir. 2012) ...................................................................................... 8

*St. Paul Fire & Marine Ins. Co. v. Renne Acquisitions Corp.*,
    No. 3:09CV476-RJC-DSC, 2010 WL 2465543 (W.D.N.C. June 14, 2010) ....................... 30

*Singer v. Reali*,
    883 F.3d 425 (4th Cir. 2018) ...................................................................................... 7

*Superior Offshore Int'l, Inc. v. Bristow Group*,
    738 F. Supp. 2d 505 (D. Del. 2010) ............................................................................. 14

*Todd v. Exxon Corp.*,
    275 F.3d 191 (2d Cir. 2001) .................................................. 9, 11, 12, 15, 16, 17, 18, 24, 25

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Shield*,
    552 F.3d 430 (6th Cir. 2008) ...................................................................................... 13-14

*Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Shield*,
    630 F.Supp.2d 842 (S.D. Ohio 2007) .......................................................................... 14

*United States v. Am. Linseed Oil Co.*,
    262 U.S. 371 (1923) ................................................................................... 12, 15, 19

*United States v. Charlotte-Mecklenburg Hosp. Auth.*
    248 F. Supp. 3d 720 (W.D.N.C. 2017) .......................................................................... 18

*United States v. Container Corp.*,
    393 U.S. 333 (1969) ................................................................................... 11, 15, 16

*United States v. Daily Gazette Co.*,
    567 F. Supp. 2d 859 (S.D.W. Va. 2008) ....................................................................... 18

*U.S. ex rel. Szymoniak v. ACE Sec. Corp.*,
    No. 13-cv-464, 2014 WL 1910876 (D.S.C. May 12, 2014) ............................................ 30

*United States v. Grinnell Corp.*,
    384 U.S. 563 (1966) ................................................................................... 24-25

v

*United States v. U.S. Gypsum Co.*,
    438 U.S. 422 (1978) ............................................................................................. 11, 15

*Volvo Const. Equipment North America, Inc. v. CLM Equipment Company, Inc.*,
    386 F.3d 581 (4th Cir. 2004) .................................................................................... 30

*Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*,
    No. 5:09-cv-433, 2010 WL 11561770 (E.D.N.C. Mar. 1, 2010) .................................. 29-30

*Wilcox v. First Interstate Bank of Or., N.A.*,
    815 F.2d 522 (9th Cir. 1987) .................................................................................... 16

*Worthington v. Bayer Healthcare*,
    No. 11-cv-2793, 2012 WL 1079716 (D.N.J. Mar. 30, 2012) ....................................... 30

## Statutes

Packers and Stockyards Act, 1921, 7 U.S.C. § 181 ....................................................... 2, 4, 27, 28

7 U.S.C. § 182 ....................................................................................................... 4

7 U.S.C. § 192 ....................................................................................................... 28

7 U.S.C. § 197 ....................................................................................................... 28

Sherman Antitrust Act, 15 U.S.C. § 1 ......................................................................... 2, 18, 27

## Other Authorities

Fed. R. Civ. P. 8 ...................................................................................................... 8

Fed. R. Civ. P. 12(b)(6) ............................................................................................ 7

Philip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their
    Application*, 4th Ed. (Aspen Pub. 2016) ................................................................ 10, 21

Herbert Hovenkamp, *The Antitrust Enterprise: Principle and Execution* (Harvard Univ. 2005) .............. 9

Richard A. Posner, *Antitrust Law*, 2nd Ed. (Univ. of Chicago Press 2001) ............................. 23

Delegation of the U.S., Org. for Economic Co-operation and Development, *Note on
    Roundtable on Information Exchange Between Competitors Under Competition Law* (October 21,
    2010), https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf ........................ 9

Federal Trade Commission and Department of Justice Antitrust Division,
    *Antitrust Guidance for Human Resources Professionals* (October 2016),
    https://www.justice.gov/atr/file/903511/download ............................................................ 20

## I.    INTRODUCTION

Plaintiffs'[1] Class Action Complaint ("CAC") alleges that Defendants[2] engaged in a nationwide conspiracy (the "Conspiracy") that suppressed compensation to a proposed class of similarly situated growers of broiler chickens ("Growers" or the "Class") in violation of (a) Section 1 of the Sherman Act ("Section 1"), and (b) Section 202 of the Packers and Stockyards Act ("PSA"). Defendants and many of their Co-Conspirators are vertically integrated poultry companies ("Integrators").[3] They and their Co-Conspirators collectively contract for over 98% of Grower services ("Grow-Out Services") in the United States. Plaintiffs are five Growers that provide Grow-Out Services to Defendants or their Co-Conspirators.

Defendants and their Co-Conspirators (the "Cartel") engaged in an overarching Conspiracy with the purpose and effect of limiting competition among Integrators for Grow-Out Services nationwide.[4] As a result of this Conspiracy, the Cartel paid Growers artificially low compensation for Grow-Out Services. The Conspiracy was effectuated through two primary means. First, the "Conspiring Integrators," *i.e.*, Defendants and the alleged Co-Conspirators, agreed to exchange current, non-public, confidential business information at a granular level, including data from which the Conspiring Integrators can ascertain each other's costs of operation as well as the base compensation paid to Growers at each individual Complex[5] (the "Information Sharing Agreement" or the "ISA"). The Conspiring Integrators use Agri Stats, Inc. ("Agri

---

[1] "Plaintiffs" refers to all plaintiffs named in the CAC. CAC ¶¶ 5-9.

[2] "Defendants" refers to, collectively, "Koch" (Koch Foods, Inc. and Koch Meat Co., Inc.) and "Sanderson" (Sanderson Farms, Inc., Sanderson Farms, Inc., Sanderson Farms, Inc. (Food Division), Sanderson Farms, Inc. (Processing Division), and Sanderson Farms, Inc. (Production Division)). CAC ¶¶ 10-17.

[3] Vertically-integrated poultry companies are the principal entities in the poultry industry. These "Integrators" control virtually every aspect of poultry production, including breeding and hatching, producing feed, providing medicine and veterinary care for their birds, and then slaughtering and processing the birds. *See* CAC ¶ 47.

[4] The same Plaintiffs filed a Complaint against these Defendant and certain of Defendants' large Integrator Co-Conspirators (the "Oklahoma Defendants"), challenging the same conduct in the Eastern District of Oklahoma. *Haff Poultry, Inc. v. Tyson Foods, Inc.*, Case No. 6:17-cv-00033-RJS (E.D. Okla. Sept. 8, 2017). Defendants in this case successfully moved for dismissal on personal jurisdiction grounds. Subsequently, Plaintiffs filed the CAC here. The Oklahoma case continues against the Oklahoma Defendants, who have filed a motion to dismiss (on similar grounds as the instant motion) and to compel arbitration. Those motions, having been fully briefed and argued, are pending.

[5] As defined in the CAC, a "Complex" is a broiler processing plant operated by a vertically-integrated poultry company such as Defendants or the Co-Conspirators. CAC ¶ 52.

1

Stats"), a purported third-party data aggregation service, to effectuate the ISA. Second, the Conspiring Integrators agreed not to hire, recruit, or solicit each other's Growers (the "No Poach Agreement" or "NPA"). These components bolster one another: the ISA permits Conspiring Integrators to coordinate Grower compensation levels to limit Growers' *incentive* to switch to different Integrators, while the NPA limits Growers' *ability* to switch. Through these independent but mutually reinforcing components, the Cartel limited Grower mobility and artificially suppressed compensation paid to all Growers.

This Conspiracy violates Section 1 of the Sherman Act and the PSA. As to Section 1, Defendants' motion to dismiss (the "Motion" or "Joint Mot.") challenges only whether the ISA and NPA are adequately pleaded when considered separately. But Plaintiffs allege a single Section 1 claim, and courts must examine the pieces of an anticompetitive course of conduct together, not broken into its component parts. Together, Plaintiffs' allegations state a Section 1 claim. Defendants' Motion—which merely repackages the same arguments their Co-Conspirators made in the Eastern District of Oklahoma—does not assert otherwise.

But even analyzed separately, the CAC's allegations are more than sufficient. As to the ISA, Plaintiffs allege the Co-Conspirators used Agri Stats to share information, and this type of reciprocal arrangement—where firms purporting to compete with each other share detailed closely-held information through a third-party conduit on the expectation that their supposed competitors provide similar information in return—is of a type commonly found to be an illegal agreement. Additionally, the information the Co-Conspirators exchanged through Agri Stats is, as set forth below, of the type that typically raises antitrust concern because it is (1) current (or future) (*i.e.*, not historical), (2) specific and detailed (*i.e.*, not aggregated), and (3) maintained confidentially (*i.e.*, not made available to Growers or consumers). The structure of the Broiler industry—*e.g.*, high concentration, fungible products, inelastic demand—is such that the exchange of such information was likely to, and did, reduce competition for Grow-Out Services and have anticompetitive effects. Several courts—including the Supreme Court—have condemned substantially the same information sharing arrangements—including those effectuated through third-party information services—under the antitrust laws.

As to the NPA, the Motion asserts that (a) Plaintiffs' allegations do not support an inference of

agreement, and that, (b) contrary to the CAC, the low rate of Growers' switching Integrators is *exclusively* the result of high exit barriers for Growers. But, as shown below, the CAC alleges sufficient facts showing (a) an illegal agreement between Defendants not to poach each other's Growers, (b) that such agreement raised barriers to mobility among Growers above and beyond any naturally existing ones, and (c) that such artificial barriers had anticompetitive effects. Multiple courts have found NPAs to be antitrust violations where they restrict worker mobility and thereby suppress compensation, as the CAC alleges. Indeed, under well accepted antitrust law and economics, the existence of high natural barriers to Grower mobility makes the NPA *more plausible* as they make an NPA more likely to be effective in suppressing competition.

Defendants also assert that the CAC only states a claim under the *per se* mode of analysis. Not so. The CAC pleads an *overarching* horizontal Conspiracy under the *per se* standard, while alternatively setting forth all the facts necessary to state a standalone ISA claim under the "rule of reason" mode of analysis. In doing so, the CAC alleges a plausible relevant services market, relevant geographic market, and anticompetitive effects—none of which elements would have been necessary under the *per se* rule, which presumes that an overarching agreement to compete is anticompetitive. Defendants challenge two aspects of the rule of reason allegations: the relevant geographic market and anticompetitive effects. They are wrong as to both. As discussed below, the CAC sets forth in detail why the alleged nationwide geographic market is plausible, and Defendants' attempt to dispute the facts is not appropriate at the pleading stage. But perhaps as importantly, even if Defendants were right that the geographic market should be narrower—and they are not right—it would be irrelevant to the sufficiency of the claim. This is because the Co-Conspirators having 98% of the national market, and thus, they would almost certainly have dominant market power in *any* smaller, regional sub-market. In other words, the Co-Conspirators are dominant everywhere in the U.S., and thus the scope of the geographic market has no bearing on the relevant element: whether Co-Conspirators have sufficient market power to cause anticompetitive effects. Additionally, Plaintiffs need not plead a relevant market where they directly plead anticompetitive effects, and the CAC contains an entire section devoted to direct allegations of the Conspiracy's anticompetitive effects, including that Grower pay was artificially driven below competitive levels, and that the suppression of Grower pay caused

3

a reduction in Broiler output, which inflated Broiler prices to consumers. These factual allegations are supported with economic theory, guidance from the DOJ, and extensive discussion of the industry.

Further, this Conspiracy violates the PSA. Under the PSA, Plaintiffs need only show that a poultry dealer[6] either (1) engaged in a practice that injured, or was likely to injure, competition, or (2) conspired, combined, agreed, or arranged with any other person to manipulate or control prices. The Conspiracy meets both criteria: the CAC alleges that (a) Defendants engaged in an overarching Conspiracy—including the NPA and ISA—to suppress Grower compensation, and that (b) this conduct injured (or, at the very least, is likely to injure) competition in the market for Grow-Out Services. These practices violate the PSA, individually and cumulatively.

Finally, Defendants argue for an erroneous application of the "first-filed rule"—a doctrine that guides courts in choosing between possible venues to adjudicate a controversy and gives priority to the court that first establishes jurisdiction over the parties. This rule applies only in cases of concurrent jurisdiction, such as where the *same parties* and issues are already before another district. That rule has no applicability here, where Defendants in this case are not the same as the Oklahoma Defendants. Defendants successfully sought dismissal from the Oklahoma Case on personal jurisdiction grounds. They are thus not invoking the rule for its intended purpose, namely to help *choose* between *possible venues* to adjudicate Plaintiffs' claims against them. Defendants instead attempt to use this rule improperly to *bar* Plaintiffs' claims against them *anywhere*.

None of Defendants' arguments supports dismissal. At most, they suggest possible defenses that Defendants may pursue, if applicable, at summary judgment or trial. The Motion should be denied.

## II.      BACKGROUND

### A.  The Structure of the Grower-Integrator Relationship

Integrators enter into contract farming arrangements ("CFAs") with Growers to care for broilers

---

[6] A "live poultry dealer" is defined as "any person engaged in the business of obtaining live poultry by purchase under a poultry growing arrangement for the purpose of either slaughtering it or selling it for slaughter by another." 7 U.S.C. § 182(10). Defendants do not dispute that they are live poultry dealers.

(young chickens bred for meat) prior to slaughter at the Integrators' Complexes. CAC ¶ 47. Growers provide land, labor, and utilities for the operation, and make substantial investments in grow-out facilities to meet the Integrators' specifications. *Id.* ¶¶ 55-57, 61, 95. Growers do not own the broilers, yet they bear the risk of loss while caring for them. Integrators control virtually every aspect of the broiler growing process including, *inter alia*: genetics; amount, type and timing of broiler delivery; composition, amount and delivery schedule of the feed; distribution of medical services; structure, temperature, ventilation, lighting duration, and other environmental aspects of grow-out facilities on the Growers' properties; and the time, method, and manner that broilers will be picked up for processing. *Id.* ¶¶ 54-55.

**B. The Grower Compensation System**

Each Integrator, including each Defendant, uses the same compensation system known as the "Tournament System." *See id.* ¶ 150. Under this system, Integrators begin with a common base compensation rate, and then compare Growers based on certain factors. *Id.* ¶ 151. Integrators pay the top-scoring Growers in each tournament pool a certain percentage above base compensation as an "incentive," and pay the low-scoring Growers a certain percentage below base compensation as a "disincentive." *Id.* ¶¶ 151-53. This is not a "profit sharing" system, however, because the total amount paid by Integrators to Growers does not increase based on overall Grower profitability or efficiency. Instead, each tournament pool's compensation is pegged to the base pay. *Id.* ¶¶ 147-54. Thus, when base pay changes, *all* Growers' compensation is affected. *See id.* ¶ 154.

**C. Defendants' Anticompetitive Conspiracy**

To increase their profits, Defendants and the other Conspiring Integrators agreed to limit competition for Grow-Out Services through a Conspiracy involving two agreements.

*First*, Defendants agreed to share current, detailed, confidential competitive information with each other through Agri Stats, a private company whose "mission is '[t]o improve the bottom line profitability of [its] participants by providing accurate and timely comparative data.'" *Id.* ¶¶ 68-69. Conspiring Integrators agreed to share data on everything from costs and capacity for production to detailed Grower compensation information. *Id.* ¶¶ 71-73. As part of the ISA, Agri Stats compiles and then disseminates the

data in such granular and disaggregated detail that any Cartel member can easily determine, for instance, what other Conspiring Integrators pay to each Grower. *Id.* ¶ 76.[7] Even if a Cartel member is unable to individually identify another Integrator's data from the Agri Stats report, Agri Stats' employees are able to confirm for Cartel members the data for a particular company at quarterly meetings with each company or at the numerous trade association meetings where Agri Stats executives present on a regular basis. *Id.* ¶ 79. Thus, "[t]he Cartel members are . . . able to constantly monitor each other's compensation levels to Growers and ensure that no Integrator is offering materially more in compensation than another." *Id.* ¶ 77. The ISA limits competition for Grow-Out Services, thereby limiting the incentive for Grower mobility because, armed with the shared data, the Co-Conspirators do not have to compete on wages for those services.[8]

**Second**, the Conspiring Integrators agreed not to hire, recruit, or solicit Growers from each other through the NPA. *Id.* ¶¶ 83-93. The NPA reduces competition for Grow-Out Services and, combined with the ISA, limits Growers' ability to switch to different Integrators. *Id.* ¶¶ 89, 96, 137, 145. The CAC recounts statements from Growers who were denied the opportunity to switch Integrators due to the "unwritten pact" among Integrators not to hire each other's Growers. *Id*. ¶¶ 84-88. The CAC also pleads that Growers switch between Integrators rarely, and far less often than would be expected in a competitive market. *Id.* ¶¶ 91-92.

Overall, the Conspiracy has anticompetitive effects on consumers and Growers alike. As to consumers, because Grower compensation is suppressed, fewer Broilers are produced than if Growers were paid a competitive amount for their services. As a result, fewer Broilers are processed and fewer are available for sale on the retail market. Thus, the Scheme serves to collectively reduce Broiler output, which ultimately causes inflated prices to final consumers. *Id.* ¶ 149; *see also Been v. O.K. Indus., Inc.*, 495 F.3d

---

[7] Defendants argue that Plaintiffs acknowledge that the data is anonymous and that "no specific factual allegations . . . support th[e] conclusion" that Integrators can disaggregate the data. Joint Mot. at 5. That is false. Although Agri Stats *purports* to anonymize this data, it is provided on such a granular basis that the Integrators ascertain the identity of the Integrator, Complex, and transactions with Growers. *Id.* ¶¶ 76-77.

[8] Notably, while Integrators agreed to share this compensation information among themselves, they do not share it with the Growers, who are subject to strict confidentiality provisions that prohibit them from sharing their own compensation information. *Id.* ¶ 66. This asymmetrical information sharing hinders Growers' ability to negotiate compensation or ascertain the market value for Grow-Out Services, while Conspiring Integrators use the information to eliminate competition for Grow-Out Services. *Id.* ¶¶ 65-66, 143-44.

6

1217, 1232 (10th Cir. 2007) (conduct that suppresses Grower comp can "result[] in injury to both poultry producers (*i.e.*, growers) and end-users (i.e., consumers)"). Some producers will either produce less or cease production altogether, resulting in less-than-optimal output of the product or service, and over the long run higher consumer prices, reduced product quality, or substitution of less efficient alternative products. As to Growers, the Conspiracy suppresses competition for Grow-Out Services and limits Grower mobility between Integrators, which, in turn, suppresses Grower compensation below competitive levels because it suppresses the Integrators' willingness or need to outbid each other for Grow-Out Services. In a competitive market, free from the effects of the Conspiracy, Integrators would compete for Grow-Out Services to retain and attract Growers and such competition would inure to the benefit of all Growers.

### D. Additional Factors Rendering the Broiler Industry Conducive to Collusion

The Conspiracy operates against the backdrop of a broiler industry characterized by numerous "plus factors" that render it susceptible to collusion, thus making the allegations in the CAC more plausible. Such factors include, *inter alia*: (1) high fixed costs of entry for potential new Integrators (CAC ¶¶ 95-96); (2) high industry concentration levels, specifically based on the market share of the Conspiring Integrators which purchase 98% of Grow-Out Services (*Id.* ¶¶ 71, 136); (3) high exit barriers for Growers, due to high debt levels (*Id.* ¶ 137); and (4) many opportunities to collude (*Id.* ¶¶ 106-27). The high fixed costs of entry for Integrators, high level of concentration, high exit barriers, and high debt levels of Growers combine to give the Conspiring Integrators a great deal of market power vis-à-vis Growers, and create the motive and ability to collude successfully. As a result, cartel behavior is more likely because it has a higher likelihood of succeeding in lowering Grower pay and reducing Broiler output.

### III. LEGAL STANDARD

Defendants fail to meet Fed. R. Civ. P. 12(b)(6)'s high burden, under which a court "accept[s] as true all well-pleaded facts in the Complaint and construe[s] them in the light most favorable to [the] plaintiff." *Singer v. Reali*, 883 F.3d 425, 429 (4th Cir. 2018). The proper inquiry is whether the complaint contains "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Id.* at 457. To survive a motion to dismiss, a plaintiff need not demonstrate that her right to relief is probable

or that alternative explanations are less likely; rather, she must merely advance her claim "across the line from conceivable to plausible." *Houck v. Substitute Tr. Servs., Inc.*, 791 F.3d 473, 484 (4th Cir. 2015) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Under *Twombly* (and its successor, *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)), "Rule 8 remains a liberal standard—a complaint need only set forth a 'short and plain statement' that gives a defendant fair notice of plaintiff's grounds for entitlement for relief." *F.T.C. v. Innovative Mktg.*, Inc., 654 F. Supp. 2d 378, 389 (D. Md. 2009). Courts throughout the country have rejected a heightened pleading requirement in anticompetitive conspiracy cases, instead applying Federal Rule of Civil Procedure 8. *Twombly*, 550 U.S. at 569 n.14.[9]

## IV.  ARGUMENT

### A.  Plaintiffs Sufficiently Plead an Anticompetitive Conspiracy in Violation of Section 1

Plaintiffs satisfy all elements of their Section 1 claim, which requires a plaintiff to show that the Defendants entered into any "contract, combination . . . , or conspiracy" that unreasonably restrains competition in the relevant market. 15 U.S.C. § 1; *see also K-Flex, Inc. v. Armacell, Inc.*, 299 F. Supp. 3d 730, 734 (E.D.N.C. 2017). "Conspiracies are often tacit or unwritten in an effort to escape detection, thus necessitating resort to circumstantial evidence to suggest that an agreement took place." *Robertson v. Sea Pines Real Estate Companies, Inc.*, 679 F.3d 278, 289-90 (4th Cir. 2012); *see also Twombly*, 550 U.S. at 553 (conspiratorial agreement may be "tacit or express").[10]

#### 1.  Plaintiffs plead a single, overarching anticompetitive Conspiracy consisting of two complementary and mutually reinforcing elements.

Plaintiffs allege that Defendants participated in an overarching Conspiracy not to compete for Grow-Out Services. The Conspiracy has two principal elements: (1) the ISA: an agreement to share their

---

[9] *E.g.*, *Evergreen Partnering Grp., Inc. v. Pactiv Corp.*, 720 F.3d 33, 46 n.3 (1st Cir. 2013) (*Twombly* "explicitly rejected a heightened pleading standard in antitrust cases"); *In re Fresh & Process Potatoes Antitrust Litig.*, 834 F. Supp. 2d 1141, 1163 (D. Idaho 2011) ("[*Twombly* and *Kendall*] did not impose the elaborate 'who-what-where-when' pleading requirement defendants insist upon.").

[10] *See also, e.g., Precision Piping & Instruments, Inc. v. E.I. duPont De Nemours & Co.*, 707 F. Supp. 225, 229 (S.D.W. Va. 1989) ("There need not be evidence of an express or formal agreement or that the alleged conspirators stated directly among themselves the object of the conspiracy, the details thereof, or the means by which such purpose was to be accomplished."); *DeLoach v. Philip Morris Companies, Inc.*, No. 1:00CV01235, 2001 WL 1301221, at *7 (M.D.N.C. July 24, 2001) ("No formal agreement is required.").

sensitive business data including the compensation paid to Growers, *e.g.*, CAC ¶¶ 68-82; and (2) the NPA: an agreement not to hire Growers from other Conspiring Integrators, *e.g.*, *id.* ¶¶ 83-93, 142. These components bolster one another: the ISA permits Conspiring Integrators to coordinate Grower compensation levels to limit Growers' *incentive* to switch to different Integrators, while the NPA limits Growers' *ability* to switch. The information sharing has also facilitated the overarching agreement not to compete for, and thereby suppress the price of, an input (Grow-Out Services) by enabling Cartel members to control and monitor the input prices. These agreements are coupled with certain "plus factors" increasing the plausibility of the Conspiracy. As in *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001), the overarching non-compete agreement is illegal *per se*, and the information sharing program is "an example of a facilitating practice that can help support an inference of a price-fixing agreement."[11]

Defendants, however, mischaracterize Plaintiffs' allegations as two discrete agreements and compartmentalize the allegations, attacking them separately.[12] Although, as demonstrated below, each agreement states a Section 1 claim by itself, Supreme Court precedent mandates that the components of the Conspiracy be analyzed together in their full context. *E.g.*, *Continental Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) ("The character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole.").[13] Similarly, in

---

[11] *In re Petroleum Prods. Antitrust Litig.*, 906 F.2d 432, 448 (9th Cir. 1990) (discussing condemnation of "practices which unjustifiably facilitate interdependent pricing and which can be readily identified and enjoined" (internal quotation marks omitted)); *In re Flat Glass Antitrust Litig. (II)*, Nos. 8-180, 11-658, 2012 WL 5383346, *3 (W.D. Pa. Nov. 1, 2012); Herbert Hovenkamp, *The Antitrust Enterprise* 131 (2005) ("[A]n agreement may be inferred from additional actions that firms take in order to make an oligopoly market more stable."); Note by Delegation of the U.S., Org. for Economic Co-operation and Development, *Roundtable on Information Exchange Between Competitors Under Competition Law* ¶¶ 3, 8-9, *available at* https://www.justice.gov/sites/default/files/atr/legacy/2014/09/17/269282.pdf.

[12] Defendants only analyze the components of the Conspiracy together when Defendants argue that "[if] Plaintiffs' [NPA] were true . . . then Defendants had no motive to enter [the ISA] so that they may 'constantly monitor' what other producers are paying." Joint Mot. at 21. Not so. The two elements of the Conspiracy are both designed to prevent competition between Conspiring Integrators over Growers, and are thus consistent and mutually reinforcing.

[13] *See also In re High Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118 (N.D. Cal. 2012) ("In antitrust conspiracy cases, plaintiffs should be given the full benefit of their proof without tightly compartmentalizing the various factual components and wiping the slate clean after scrutiny of each" (internal quotations omitted)); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1208 (N.D.

*Milliken & Co. v. CNA Holdings, Inc.*, the Western District of North Carolina rejected the defendants' request to "parse and dismember" the complaint. No. 3:08-CV-578, 2011 WL 3444013, at *10 (W.D.N.C. Aug. 8, 2011). *Milliken* stated that: "Nothing in *Twombly* . . . contemplates this 'dismemberment' approach to assessing the sufficiency of a complaint. Rather, a district court must consider a complaint in its entirety without isolating each allegation for individualized review." *Id.*; *see also Metro. Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 18 F. Supp. 3d 662, 674 n.12 (D. Md. 2013).[14]

### 2. Plaintiffs sufficiently plead a Section 1 violation arising from the ISA.

Even if viewed as a standalone claim, the ISA allegations satisfy Section 1. There is "a closely related but analytically distinct type of claim, also based on [Section 1], where the violation lies in the information exchange itself—as opposed to merely using the information exchange as evidence upon which to infer a price-fixing agreement." *Todd*, 275 F.3d at 198; *see also* Phillip E. Areeda & Herbert Hovenkamp, *Antitrust Law: An Analysis of Antitrust Principles and Their Application* ¶ 1436b2 (4th ed. 2017) ("Areeda") ("The information exchange itself embodies a conspiracy to meet or exchange, and that conspiracy may be illegal if unreasonable because it is likely to contribute to anticompetitive results without adequate justification."). In such cases, the "exchange of information is not illegal *per se*, but can be found unlawful under a rule of reason analysis." *Todd*, 275 F.3d at 198. Here, Defendants' program for sharing highly-detailed, regularly-updated, confidential business information enabled Integrators to suppress competition in the market for Grow-Out Services and violates Section 1 under the rule of reason.[15]

#### a. The ISA allegations alone state a claim under the rule of reason.

Cal. 2015) ("Defendants' disagreements with Plaintiffs' characterizations or interpretations of certain factual allegations do not go to the sufficiency of Plaintiffs' allegations on a motion to dismiss.") (citation omitted); *id.* at 1212 (noting that "courts have generally rejected attempts by defendants to recharacterize a plaintiff's theory of an overarching conspiracy" and collecting cases).

[14] *See* Ex. 1 at 13-14, 45 (transcript from 12(b)(6) argument) (Judge Shelby: "I read Rule 12 to be that a claim succeeds or fails. . . . My view has always been, well, then the motion to dismiss is denied; if we're going to start parsing parts of claims, that's Rule 56 stuff, not Rule 12 stuff . . . [Plaintiffs plead] a single count for agreement in restraint of trade, in violation of Section 1 of the Sherman Antitrust Act. It doesn't . . . set forth two separate claims; it's a single claim.").

[15] Ex. 1 at 12-13 ("[Judge Shelby:] The information sharing agreement that's alleged in the complaint, in my view, assuming the truth of all the allegations in the complaints, does seem sufficient.").

The CAC sufficiently pleads a standalone Section 1 claim based on the ISA. The information exchanged through Agri Stats is, as set forth below, of the type that typically concerns courts because it is (1) current (or future), (2) specific and detailed, and (3) maintained confidentially. Second, the structure of the Broiler industry—*e.g.*, high concentration, fungible products, inelastic demand—is such that the exchange of such information was likely to, and did, reduce competition for Grow-Out Services and have anticompetitive effects. *United States v. U.S. Gypsum Co.*, 438 U.S. 422, 441 n.16 (1978) (courts look to industry structure and nature of information exchanged "in divining the procompetitive or anticompetitive effects of this type of interseller communication").

> **i.  Defendants' agreement to participate in the Agri Stats program is an unlawful horizontal agreement under Section 1.**

Plaintiffs allege directly that "the Cartel members illegally agreed to share detailed data on Grower compensation with one another, with the purpose and effect of artificially depressing Grower compensation below competitive levels." CAC ¶ 2; *see also id.* ¶ 68 ("Defendants and their Co-Conspirators have agreed to and have shared with themselves (but not with Growers) detailed Grower compensation information."). By agreeing to provide confidential business information to Agri Stats in exchange for receiving Co-Conspirators confidential business information, each Defendant engaged in illicit concerted action. In the context of agreements to exchange information, horizontal competitors engage in concerted action through the simple reciprocal act of sharing material information. In *United States v. Container Corp.*, 393 U.S. 333 (1969), for example, the Supreme Court condemned an "informal" agreement characterized by "an infrequency and irregularity of price exchanges" between competitors. *Id.* at 335-38. "[A]ll that was present was a request by each defendant of its competitor" for recent price information and that the competitor "usually furnished the data with the expectation that it would be furnished reciprocal information when it wanted it." *Id.* at 335. The Court emphasized that sharing information creates an expectation of ***reciprocity***: "when a defendant requested and received price information it was affirming its willingness to furnish such information." *Id.*; *see also In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 902 (N.D. Cal. 2008) ("[T]he exchange of price information alone can be 'sufficient to establish the

combination or conspiracy, the initial ingredient of a violation of [Section 1].'").

Here, each Co-Conspirator agreed to share its information through Agri Stats *because* the others had also agreed. Absent mutual agreement—especially given that Defendants and their Co-Conspirators comprised 98% of the market—the program would have been worthless. *The point of the Agri Stats program was* **reciprocity among the Co-Conspirators:** No mutual commitment to exchange information, no program. Thus, by agreeing to provide information with the expectation of receiving the same, the Conspiring Integrators entered into an agreement in violation of Section 1. *See, e.g.*, CAC ¶¶ 68-82. Their anticompetitive *purpose* is conceded in their moving papers: they exchange this data, which *includes Grower compensation* data, to make so-called "efficiency enhancing adjustments," *which include lower Grower compensation*. Joint Mot. at 2. Several courts have condemned substantially the same information sharing arrangements under the antitrust laws. *See, e.g.*, *United States v. American Linseed*, 262 U.S. 371 (1923); *Am. Column & Lumber Co.*, 257 U.S. 377 (1921); *Todd v. Exxon*, 275 F.3d 191 (2d Cir. 2001); *In re SRAM*, 580 F. Supp. 2d 896 (N.D. Cal. 2008). In each of these cases, the agreement among the participants in the information sharing scheme was inferred from the course of conduct in participating in the reciprocal sharing of information among competitors.

In asserting that Plaintiffs fail to allege an agreement, Defendants mischaracterize the ISA as a "hub-and-spoke" or "rimless wheel" conspiracy, defined as "one in which various defendants enter into separate agreements with a common defendant, but *where the defendants have no connection with one another, other than the common defendant's involvement in each transaction*." *Dickson v. Microsoft Corp.*, 309 F.3d 193, 203 (4th Cir. 2002) (emphasis added). In a "hub-and-spoke" conspiracy, the "hub" and the "spokes" are at different levels of the market (*e.g.*, manufacturer and distributors; distributor and retailers; etc.), and the agreements are undertaken at the behest of the hub and for the benefit of the hub. For example, in *Dickson*, the plaintiff alleged that two major computer manufacturers (the spokes) entered into licensing agreements with Microsoft (the hub) at Microsoft's behest and for the purpose of helping Microsoft maintain its monopoly in the market for computer operating systems. *Id.* at 199. The court made clear that the agreements between Microsoft and each manufacturer were "two separate vertical conspiracies," *id.* at

12

200, and that while Microsoft provided compensation to the manufacturers in exchange for their entering into the restrictive license agreements, there was no allegation that the manufacturers each benefited from the agreements entered into by the other or from the scheme as a whole. *Id.* at 199-201.[16]

By contrast, here Plaintiffs allege that the ***horizontal competitor*** Integrators entered into the ISA, with the expectation of reciprocity among all the *horizontal* participants for the benefit of the participants. Indeed, the purpose of the program was to share each other's information via Agri Stats, and thus, all participants had a connection to each other as participants in the ISA. Moreover, the Agri Stats program was for the benefit of Integrators—not for the benefit of Agri Stats or some other "hub" at a different level of the market. Agri Stats is not a downstream or upstream market participant (or even a market participant at all). Rather, Agri Stats is a device used by the members of this Cartel to facilitate information gathering and sharing. Defendants implicitly concede that the ISA was for the benefit of all the Integrators because, as Defendants assert, the purpose of the Agri Stats program was to help the Integrators reduce their costs, including Grower pay. This is not a "rimless wheel" case where "the defendants have no connection with one another, other than the common defendant's involvement in each transaction." *Id.* at 203.[17]

---

[16] In *Interstate Circuit, Inc. v. United States*, 306 U.S. 208 (1939), one of the early archetypal hub-and-spoke cases, several motion picture distributors (the spokes) each entered into agreements with the dominant motion picture exhibitors (the hubs) for the purpose of restraining competition in the market for showing movies *for the benefit of the exhibitors*. *Id.* at 218-19. The Supreme Court in that case rejected an argument, like Defendants' argument here, that there was insufficient evidence of an agreement among the distributors (i.e., the "spokes") to find them liable under Section 1 of the Sherman Act. The Court acknowledged there was no direct evidence of the conspiracy, but instead relied on "inferences drawn from the course of conduct of the alleged conspirators." *Id.* at 221. This course of conduct was primarily the fact that the distributors all knew that the same agreements were requested of the other distributors, and from the fact that there was uniformity in the way the restrictions were enacted by the distributors. *Id.* at 221-25. But the Court went on to hold that there would still be a Section 1 violation even if there were no agreement, as long as "knowing that concerted action was contemplated and invited, the distributors gave their adherence to the scheme and participated in it." *Id.* at 226.

[17] Defendants also cite *Mylan Labs., Inc. v. Akzo, N.V.*, 770 F. Supp. 1053 (D. Md. 1991), Joint Mot. at 18, which supports Plaintiffs. In that case, the court held that the plaintiff "need not show that each alleged conspirator had knowledge of all of the details of the conspiracy, but . . . must show that each alleged conspirator participated in the conspiracy with knowledge of the essential nature of the plan." *Id.* at 1066-67 (internal citation and quotation marks omitted). That is precisely what Plaintiffs allege here – the Co-Conspirators all shared information with the purpose and intent of sharing information in order to "benchmark" and thereby suppress Grower pay. *Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Shield*, 552 F.3d 430 (6th Cir. 2008), is inapposite. In that case, plaintiff – an Anthem insurance agency

13

Defendants' argument also implies that the ISA's operation through third party Agri Stats somehow negates the conspiracy. That would be absurd. The use of a third party to gather and disseminate information is a hallmark of illegal information sharing programs. For example, in *American Linseed*, the defendants—all competitors in linseed processing—sent confidential business information to a third-party, "Armstrong Bureau of Related Industries," which operated "a so-called 'exchange' through which one subscribing manufacturer may obtain detailed information concerning the affairs of others doing like business." 262 U.S. at 380. The Bureau provided this service for other industries, and while all linseed processors *agreed with the Bureau* to be part of the program, there was no evidence that they had agreed *with each other* to use the Bureau. Nevertheless, the Court found that the information exchange involved an agreement amongst and between those sharing the information through the Bureau. *Id.* at 389. That is, regardless of the formal structure, the defendants exchanging information via the Bureau "[o]bviously . . . were not bona fide competitors." *Id.* at 390. Here, each Conspiring Integrator provided information to Agri Stats so as to receive the other Integrators' confidential sales information, thereby restricting competition rather than engaging as "bona fide competitors."[18] That is an agreement.

---

– alleged that other Anthem agents conspired with Anthem to boycott the plaintiff. *Id.* at 432. But as is clear from the district court decision, there was no evidence that the alleged "spokes" had entered into any sort of agreement, and there was certainly no evidence, as there is here, of a reciprocal agreement among horizontal competitors to participate in an anticompetitive program. *See Total Benefits Planning Agency, Inc. v. Anthem Blue Cross Blue Shield*, 630 F.Supp.2d 842, 845-46 (S.D. Ohio 2007). That is, unlike this case, there was no reciprocity and no benefit to the agents arising from the series of agreements.

[18] Defendants cite *Burtch v. Milberg Factors, Inc.*, 662 F.3d 212 (3d Cir. 2011), for the irrelevant proposition that mere exchange of information through benchmarking is not unlawful. Joint Mot. at 17. *Burtch* involved sporadic exchanges involving a single insolvent customer, that were not part of any formal program, and which did not support an anticompetitive purpose that harmed competition in the relevant market. Moreover, in *Burtch*, it was in the unilateral interest of each financial institution to deny credit to the plaintiff, so there was no evidence of any commitment to a common scheme. By contrast, in this case, it would *not* be in the unilateral interest of any Integrator to share confidential information; each Integrator benefits only when it receives the information from all other participants in the Agri Stats program. Defendants also rely on *Superior Offshore Int'l, Inc. v. Bristow Group*, 738 F. Supp. 2d 505 (D. Del. 2010), Joint Mot. at 20, for a similar proposition—namely, that the mere sharing of information is not actionable. Joint Mot. at 20. *Superior Offshore* is inapposite because the court found that plaintiff had "set[] forth no facts permitting an inference that the data shared *had any impact on pricing decisions*." 738 F. Supp. 2d at 516 (emphasis added). Here, by contrast, the essence of the information-sharing Section 1 claim is that, given the structure of the industry and the nature of the information exchanged, the information sharing itself had a direct effect on Grower compensation. CAC ¶¶ 143-44.

ii. **The information exchanged through the ISA is of the type that has traditionally raised concern of anticompetitive effects.**

The information exchanged among would-be horizontal competitors through Agri Stats is of the type that typically raises antitrust concern because the information is (1) current (or future), (2) specific and detailed, and (3) confidential or otherwise non-public. *Todd*, 275 F.3d at 211-13. Such information is particularly likely to cause effective coordination and limit competition.

First, "[e]xchanges of current price information . . . have the greatest potential for generating anticompetitive effects." *U.S. Gypsum*, 438 U.S. at 441 n.16. Unlike historical business information, the exchange of current price information helps would-be competitors coordinate their pricing (or, as here, compensation) decisions. *See In re Petroleum Prods.*, 906 F.2d at 448 (discussing condemnation of "practices which unjustifiably facilitate interdependent pricing and which can be readily identified and enjoined" (internal quotation marks omitted)).[19] This disruption of the ordinary competitive mechanism harms those, like Growers, who would stand to benefit from real competition. The CAC alleges an exchange of current and sometimes future information, including Grower compensation as well as cost, output and capacity information by all members of the Cartel. *E.g.*, CAC ¶¶ 71-73. This enabled the Conspiring Integrators to disrupt competition for Grow-Out Services, thereby suppressing compensation to Growers, reducing Broiler output, and artificially inflating prices to consumers. CAC ¶¶ 143-50; *see also U.S. Gypsum*, 438 U.S. at 441 n.16; *Todd*, 275 F.3d at 211; *Been*, 495 F.3d at 1232.

Second, "[i]n addition to the time frame, another factor courts look to [in evaluating the legality of information exchanges] is the specificity of the information." *Todd*, 275 F.3d at 212. Courts have repeatedly condemned as a Section 1 violation the sharing of granular, comprehensive, confidential business information, such as prices charged (current or in the past), costs of production and selling, production capacity, production volume and salary information. *See, e.g.*, *Container Corp.*, 393 U.S. at 336-37; *Am. Linseed Oil Co.*, 262 U.S. at 380-81; *Am. Column & Lumber Co.*, 257 U.S. at 394; *Todd*, 275 F.3d at 212.

---

[19] *See also* Areeda, ¶ 2113e ("[W]e would consider direct interseller communications of current prices on specific transactions to be 'nearly naked' restraints.").

This, again, is because the more specific and the less anonymized the information, the easier it is for the would-be competitors to coordinate and avoid competing. Here, the information exchanged is precisely the type often condemned: the Cartel exchanged on a weekly basis current cost and price information, including data on the Integrators' flocks (including mortality and weight gain), feed and equipment used in grow-out facilities, transportation costs, operating profits, future capacity, facility locations, and—importantly— Grower compensation. CAC ¶¶ 71-74. Although Agri Stats purports to anonymize this data, it is provided on such a granular basis that the Integrators ascertain the identity of the Integrator, Complex, and transactions with Growers. *Id.* ¶¶ 76-77.

Third, courts are concerned when competitors exchange non-public information, in part, because it creates an information asymmetry that gives a buyers' cartel unfair bargaining power over its suppliers, allowing them to disrupt competition and suppress compensation. *Todd*, 275 F.3d at 213; *see also Wilcox v. First Interstate Bank of Or., N.A.*, 815 F.2d 522, 526 (9th Cir. 1987) (distinguishing the exchange of private/confidential information (which *Container Corp.* determined had an anticompetitive effect on the industry) from the exchange of public information (which does not raise similar concerns)). Here, Agri Stats and the Conspiring Integrators treat the information as highly confidential. It is not publicly available and not made available to Growers. CAC ¶ 79. Conspiring Integrators have insuperable leverage over the Growers with whom they deal because of the information asymmetry caused by the ISA, which enables them to suppress compensation below the levels obtainable in a competitive market. *Id.*

### iii. The structure of the market for Grow-Out Services renders it susceptible to harm through information sharing by would be competitors.

The market for Grow-Out Services is particularly susceptible to the ISA as it (1) is highly concentrated, (2) involves fungible products, and (3) is subject to inelastic demand. *Todd*, 275 F.3d at 208.

First, with respect to market concentration, courts focus on the percentage of the market that is subject to the information sharing program; the higher the participating market share, the more susceptible the market is to anticompetitive harm through information sharing. Concentration matters because it makes tacit coordination among participants easier and renders the effects of the interdependent horizontal

16

coordination more widespread. *E.g.*, *Container Corp.*, 393 U.S. at 342 (18 firms with 90% of market); *Am. Column & Lumber Co.*, 257 U.S. at 410 (365 firms with 33% of market); *Todd*, 275 F.3d at 208-09 (14 firms comprising 80-90% of market). As alleged in the CAC, the market for Grow-Out Services is highly concentrated. The Conspiring Integrators account for 98% of Broiler production within the U.S. CAC ¶ 71. This high-degree of concentration makes the ISA more likely to cause anticompetitive harm.

Second, information sharing among buyers of fungible products or services is more likely to cause anticompetitive harm because it is easier for co-conspirators to tacitly coordinate the prices they offer when price (and not other qualitative factors) is the primary basis of competition. *Todd*, 275 F.3d at 209. In a case relating to compensation, such as this, the relevant inquiry is "whether jobs at the various [defendants] were comparable, or fungible enough so that the defendants could have used the exchanged information as part of a tacit conspiracy to depress salaries." *Todd*, 275 F.3d at 209. As alleged in the CAC, "Grow-Out Services are fungible. Growers care for Broilers using Integrators' own birds, feed, and medicine. Growers bring to the table labor, investment capital, and land that are largely homogenous." CAC ¶ 105. This fungibility of Grow-Out Services helps facilitate the anticompetitive effects caused by the ISA.

Third, information sharing is more likely to cause anticompetitive harm where demand for the product or service is inelastic because inelastic demand reduces the bargaining power of sellers (here Growers). Demand is inelastic when a seller (*e.g.*, a Grower) cannot hold out for some period of time for a better price from the buyer (*e.g.*, an Integrator). *See Todd*, 275 F.3d at 210. Where "the supply at issue is the labor of the [plaintiff] employees," the demand is often inelastic because "[l]abor is an extremely perishable commodity—an hour not worked today can never be recovered." *Id.* at 209 (internal citation and quotation marks omitted). Here, the demand for Grow-Out Services is inelastic. CAC ¶¶ 94, 96-104.

### iv.  Plaintiffs do not plead the ISA (in isolation) as a *per se* claim.

Defendants also contend that Plaintiffs allege only a *per se* illegal Section 1 information sharing claim is wrong and should be rejected. Joint Mot. at 14-16. This is wrong.

The CAC states a claim under Section 1 of the Sherman Act regarding an overarching conspiracy to suppress Grower pay that includes (1) an agreement by the Co-Conspirator Integrators not to poach each

17

other's Growers, and (2) an agreement by the Co-Conspirator Integrators to share information with the purpose and effect of using that information to suppress Grower pay. The CAC alleges, correctly, that the overarching conspiracy and the standalone no poach agreement are *per se* violations of the Sherman Act. Under the *per se* rule, proof of the existence of the conspiracy is sufficient to state a claim under the Sherman Act, and there is no further requirement to prove market power or anticompetitive effects. *E.g.*, *United States v. Daily Gazette Co.*, 567 F. Supp. 2d 859, 866 n.4 (S.D.W. Va. 2008); *Berlyn, Inc. v. The Gazette Newspapers, Inc.*, 157 F. Supp. 2d 609, 615 (D. Md. 2001).

The ISA *considered in isolation*, however, would be analyzed under the "rule of reason." In the absence of proof of the kind of actual detrimental effects found in *Indiana Federation of Dentists*, courts applying the rule of reason require proof of market power in the relevant market. *Todd*, 275 F.3d at 199, 213; *United States v. Charlotte-Mecklenburg Hosp. Auth.*, 248 F. Supp. 3d 720, 728 (W.D.N.C. 2017). Thus, the CAC spells out in detail—in sections titled "RELEVANT MARKET ALLEGATIONS" and "ANTICOMPETITIVE EFFECTS"—how the relevant market would be defined, that Defendants have market power in the relevant market, and that the Conspiracy caused anticompetitive effects. CAC ¶¶ 133-40, 141-57. Pleading this Section 1 claim under the *per se* rule and the rule of reason is proper here, and "[a]n antitrust plaintiff . . . does not waive his ability to pursue a rule of reason claim simply by arguing that a conspiracy should be found *per se* unlawful." *In re Processed Egg Products Antitrust Litig.*, 206 F. Supp. 3d 1033, 1051 (2016).[20] Thus, Defendants are on notice of the nature of Plaintiffs' claim and the contours of the alleged relevant market.

Indeed, it seems that Defendants only make this argument to back-door purported procompetitive justifications for their anticompetitive conduct (*i.e.*, that the ISA is mere "benchmarking" that enables

---

[20] *See also Animation Workers*, 123 F. Supp. 3d at 1212 ("That Defendants choose to re-cast Plaintiffs' allegations as supporting the existence of two separate conspiracies does not change the fact that Plaintiffs have alleged the existence of a single conspiracy, involving a single group of conspirators, that allegedly engaged in the same anticompetitive behavior."). In that case, the plaintiffs alleged a similar scheme to depress worker compensation through both information sharing and a non-solicitation agreement among competitors. The court went on to say that "taken in context, the factual allegations here plausibly suggest that the purpose of information sharing and the anti-solicitation scheme was to suppress wages." *Id.* at 1214.

Defendants "to produce chickens as efficiently as possible"). Joint Mot. at 1, 2, 4, 5, 15, 17, 19. But, first, one person's "benchmarking" is another person's wage suppression cartel. If, as alleged—and apparently admitted—Co-Conspirators are sharing granular information with the intent and effect of reducing Grower pay, that is a Section 1 violation. *E.g.*, *High Tech*, 856 F. Supp. 2d at 1123 (suppressed wages are cognizable antitrust injury); *Kamakahi v. Am. Soc'y for Reprod. Med.*, 305 F.R.D. 164, 190 (N.D. Cal. 2015) (same); *Merenda v. VHS of Michigan, Inc.*, 296 F.R.D. 528, 536 (E.D. Mich. 2013) (same). Second, adjudicating whether the alleged "benchmarking" has some procompetitive effects (in addition to the admitted anticompetitive ones) is a fact intensive inquiry not appropriate now. *E.g.*, *Retrophin, Inc. v. Questcor Pharmaceuticals, Inc.*, 41 F. Supp. 3d 906, 918 (C.D. Cal. 2014) (existence of valid business justification ordinarily a fact question); *In re eBay Seller Antitrust Litig.*, 545 F. Supp. 2d 1027, 1033 (N.D. Cal.) ("A procompetitive benefit may rebut a *prima facie* case. However, to survive dismissal Plaintiffs are required only to establish a *prima facie* case.").[21] Moreover, "benchmarking" can be illegal under the Sherman Act—even where it may allow producers to lower costs—if the industry structure and the nature of the information exchanged are such that competition is harmed. *E.g.*, *Am. Linseed*, 262 U.S. at 380-81. In short, the CAC more than sufficiently alleges the ISA violates Section 1 of the Sherman Act under the rule of reason.[22]

### 3. Plaintiffs sufficiently plead a Section 1 violation arising out of the NPA.

Plaintiffs also plead the NPA pursuant to which the Conspiring Integrators agreed not to hire each other's Growers. Such agreements are anticompetitive where, as here, they reduce competition for labor

---

[21] Although it is Defendants' burden to prove any procompetitive justifications, Plaintiffs allege there were no "countervailing procompetitive benefits." CAC ¶ 142. Any legitimate procompetitive justifications—if there are any—must await summary judgment because they are outside the four corners of the CAC. *E.g.*, *Linlor v. Polson*, 263 F. Supp. 3d 613, 618 (E.D. Va. 2017); *Buckhannon Bd. & Care Home, Inc. v. W. Virginia Dep't of Health & Human Res.*, 19 F. Supp. 2d 567, 572 (N.D.W. Va. 1998).

[22] Defendants cite *Maple Flooring Mfrs. v. United States*, 268 U.S. 563 (1925), an appeal from a district court injunction, as purportedly blessing their information sharing as procompetitive. Joint Mot. at 15, 21. But, in *Maple Flooring*, the information exchanged had none of the tell-tale signs of an illegal agreement. Unlike here, the information was summarized by the trade group and shared so that it could not be disaggregated by manufacturer, and it was disseminated to the public, including to buyers of the manufacturers' products. *Id.* at 566. Additionally, there was no evidence that the information sharing had any effect on "prices, production, and competition in the flooring industry." *Id.* at 567-68, 575-76.

and suppress wages. *E.g.*, *Animation Workers*, 123 F. Supp. 3d at 1214; *High-Tech*, 856 F. Supp. 2d at 1122-23; *see also Antitrust Guidance for Human Resources Professionals*, issued by DOJ's Antitrust Division and Federal Trade Commission (Oct. 2016), *available at* https://www.justice.gov/atr/file/903511/download ("Naked wage-fixing or no-poaching agreements among employers, whether entered into directly or through a third-party intermediary, are per se illegal.").

The CAC alleges that all Defendants subscribed to an "unwritten pact" not to (1) solicit or recruit Growers from one another, or (2) hire Growers from each other. *E.g.*, CAC ¶¶ 83-93. Specifically, the CAC pleads the NPA with four types of allegations: First, the CAC alleges direct evidence of the NPA through several statements of Growers, each of whom was apprised of the agreement or became aware of it when he or she was denied the opportunity to switch. *E.g.*, *id.* ¶ 84 (citing Tyson Grower's statement that employee of Co-Conspirator (Peco Foods) that Tyson and Peco had an NPA); *id.* ¶¶ 86-88 (quoting testimony by Growers regarding the NPA). Second, the CAC alleges circumstantial evidence, including that Growers rarely switch between Integrators and that such switches only occur when the Integrator losing the Grower stands to benefit (such as when an Integrator has too many Growers or is closing a Complex). *E.g.*, *id.* ¶¶ 89-92. Third, the CAC alleges that industry structure and conditions render the market susceptible to effective collusion. *See* Section IV(A)(2)(a)(iii), *supra.* Fourth, Plaintiffs allege the ISA, which is, in part, a facilitating practice to the NPA, demonstrates that Defendants and their Co-Conspirators had a cooperative relationship instead of one characterized by competition. Taken together, these allegations are more than sufficient to plead the NPA.

Defendants assert that the high barriers for Growers seeking to move between Integrators (due to, *e.g.*, certain Integrator-specific requirements imposed by Cartel members) is an "obvious, alternative explanation" to the allegations of the NPA, making the NPA implausible. Joint Mot. at 11-12. Defendants effectively ask: "If switching was already difficult, why would Defendants need to make it even more difficult?" The answer is that the more competition is restricted, the less Growers get paid (and the more money the Integrators keep as profits). Antitrust law makes clear that high natural exit (or entry) barriers make an illicit agreement more plausible, *not less. In re Automotive Parts Antitrust Litig.*, 29 F. Supp. 3d

982, 996 (E.D. Mich. 2014) (finding the pleaded highly concentrated market with "high barriers to entry 'facilitate the formation and maintenance of a cartel'"); *see also* Areeda, ¶ 941a ("The effect of significant entry [or exit] barriers is to enable a . . . cartel or oligopoly persistently to maintain higher than competitive prices while yet deterring immediate entry that would drive prices back to the competitive level."). In any event, resolving the factual question of whether the low observed rate of switching is because of the high exit barriers, or if, as alleged, the NPA contributed to that low rate is inappropriate on a Rule 12 motion.

After arguing that the relative *absence* of switching makes the NPA implausible, Defendants next assert that the *existence* of switching makes the NPA implausible. Joint Mot. at 9. Defendants assert that, "[Plaintiffs] concede [that] 2.88% of Growers actually switched producers and about 5% of Growers were able to switch in 2014." Joint Mot. at 9. Defendants omit the crux of the allegation. The CAC alleges that, under the NPA, Growers are only permitted to switch Integrators when doing so "is accompanied by a benefit *to the Integrator the Grower is leaving*." *Compare* CAC ¶ 92 *with* Joint Mot. at 9. In a competitive market, without the NPA, Integrators would hire one another's Growers regardless of whether the competitor Integrator losing the Grower stood to benefit; indeed, in a world where Integrators were not coordinating, depriving a rival of an important resource would be a benefit to the acquiring Integrator.

Defendants then argue that Plaintiffs are required to allege "a parallel *change* in Defendants' hiring patterns circa 2008 (when the conspiracy allegedly began)." Joint Mot. at 9. That is not the law. Defendants misquote *Twombly*, which did *not* hold, as Defendants assert, that "parallel-conduct allegations fail absent, *e.g.,* 'complex and historically unprecedented changes in [behavior] made at the very same time by multiple competitors.'" *Id. Twombly* instead cites to commentators' "*examples* of parallel conduct allegations that would state a § 1 claim," and noted that "[t]he *parties in this case agree* that 'complex and historically unprecedented changes in pricing structure made at the very same time by multiple competitors, and made for no other discernible reason,' would support a plausible inference of conspiracy." *Twombly*, 550 U.S. at 557 n.4 (emphasis added). Allegations of simultaneous changes by multiple competitors could support a conspiracy claim, but those allegations are not required.

Defendants further argue that Plaintiffs have not pleaded the details of Defendants' actions taken

in furtherance of the no poach conspiracy. But courts "do not require plaintiffs in complex . . . antitrust cases to plead detailed, defendant-by-defendant allegations; instead they require plaintiffs to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy." *In re Cathode Ray Tube*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (quotation marks and citation omitted); *see also SRAM*, 580 F. Supp. 2d at 904 (argument that "Plaintiffs have failed to allege how each individual Defendant participated in the alleged conspiracy" failed because it "rel[ied] upon the standard for a motion for summary judgment"). Plaintiffs allege that *all Defendants* (and the alleged Conspiring Integrators) participated in a multilateral NPA as part of the overarching Conspiracy and allege specific facts to support the NPA's existence. CAC ¶¶ 3, 83, 142.

Plaintiffs allege that Growers who operated in areas serving multiple Integrators were unable to switch Integrators due to the "unwritten pact" between the Integrators. *Id.* ¶¶ 85-89 (Growers' statements concerning Integrators' "unwritten pact," "written [sic] rule," and refusal to "cross the lines to [recruit a Grower]"). These allegations are more than sufficient. *See In re Dental Supplies Antitrust Litig.*, No. 16-cv-696, 2016 WL 5415681, at *4 (E.D.N.Y. Sept. 28, 2016) ("Defendants are correct that [the anti-poaching agreement allegations] are less developed at this stage than others[, and although, t]his particular allegation has minimal detail, and that detail only involves [two of the three defendants,] the allegations in the [complaint] in its entirety are enough to merit further exploration through discovery."); *see also High Tech*, 856 F. Sup. 2d at 1121 (denying motion to dismiss because, "[i]n light of Plaintiffs' specific allegations concerning the industry-wide procompetitive effects of cold calling recruiting practices, it is plausible to infer that even a single bilateral agreement would have the ripple effect of depressing the mobility and compensation of employees of companies that are not direct parties to the agreement"); *Animation Workers*, 123 F. Supp. 3d at 1209-10.

### 4. Plaintiffs allege relevant plus factors.

Contrary to Defendants' assertion, Joint Mot. at 12-14, Plaintiffs plead numerous "plus factors," which, considered together with the other allegations, make Plaintiffs' Section 1 claim more plausible. *See* Section II(D), *supra* (listing plus factors). These factors give the Conspiring Integrators a great deal of

22

market power vis-à-vis Growers and create the motive and ability to collude successfully. Defendants dispute the probity of "opportunity evidence," such as, *e.g.*, that Cartel members had multiple opportunities to collude at trade association meetings, or that the movement of top executives created such opportunities. Joint Mot. at 12-13. But courts have repeatedly held that meetings between rivals creating the opportunity for collusion, make a conspiracy more plausible, particularly where other plus factors are well-pleaded. *E.g.*, *B&R Supermarket, Inc. v. Visa, Inc.*, No. 16-cv-1150, 2016 WL 5725010, at *8 (N.D. Cal. Sept. 30, 2016) (concluding that allegations regarding the opportunity to collude, while not sufficient alone, support the plausibility of an impermissible conspiracy); *High Tech*, 856 F. Supp. 2d at 1118 (observing that overlapping board membership "may indicate an opportunity to conspire")).[23] And Plaintiffs go beyond naked allegations of trade association meetings, alleging numerous specific meetings, including those organized by Agri Stats, which facilitated the ISA.

      Plaintiffs also allege that the Conspirators "permit high level employees to regularly move between companies **without non-compete limitations or confidentiality agreements** that would protect a company's (seemingly) proprietary business knowledge and customer base." CAC ¶ 82 (emphasis added). The point is not that Koch and Sanderson executives in particular traded places, but that the movement between executives evidences the alleged co-conspirators' lack of concern with revealing their confidential business information to supposed competitors. And the industry characteristics that Defendants claim are irrelevant are those that authorities widely recognize render industries susceptible to collusion. Richard A. Posner, *Antitrust Law* (2d ed. 2001) at 60-69 (citing high entry barriers, inelastic demand, market concentration,

---

[23] Defendants rely on *American Dental Association v. Cigna Corp.*, 605 F.3d 1283, 1285-86 (11th Cir. 2010) and *Hall v. United Air Lines, Inc.*, 296 F. Supp. 2d 652 (E.D.N.C. 2003), for the proposition that opportunity evidence related to trade association participation "provides no indications of conspiracy." Joint Mot. at 12. *American Dental*, however, was a RICO case subject to the heightened Fed. R. Civ. P. 9(b) pleading standard. Plaintiffs do not allege that merely participating in trade association meetings is illegal. Rather Plaintiffs' point is that the Conspiring Integrators had the opportunity to reach and discuss the NPA (and ISA) at those meetings, which makes Plaintiffs' allegations as to the overarching Conspiracy, the NPA, and the ISA more plausible under well-established law. If hypothetically the Co-Conspirators had never met or spoken with each other, Defendants would use that as evidence that the Conspiracy is implausible. Conversely, the fact that they interact repeatedly makes Conspiracy more likely. And *Hall* was a summary judgment decision – not the appropriate standard at the motion to dismiss stage.

and the antitrust record of market participants as facilitating collusion).

### 5. Plaintiffs allege a plausible relevant market and anticompetitive effects.

Defendants also claim that Plaintiffs fail to plead anticompetitive effects in a plausible relevant market. Joint Mot. at 21-26. That is wrong and should be rejected, for many reasons.

*First*, the CAC spells out how the relevant antitrust market should be defined in this case. CAC ¶¶ 133-40. In an antitrust case, the relevant geographic market is defined by reference to whether changes in price—or here, Grower pay—would cause new or existing customers—or here, Growers—to move locations in response to such changes. *K-Flex*, 299 F. Supp. 3d at 735 ("The appropriate geographic market is the area within which the defendant's customers . . . can practicably turn to alternative supplies if the defendant were to raise its prices. The market can be the entire nation.").[24] The CAC satisfies this test. As set forth in the CAC, "[t]he relevant geographic market is the United States," CAC ¶ 133, because "[a]bsent the conduct challenged in this Complaint, Integrators would consider each other to be competitors for Broiler Grow-Out Services whether Integrators happen to be in the same region or not, given that Integrators (a) could open plants in areas where another Integrator (or other Integrators) already exist, and (b) would compete with each other on a nation-wide basis for established Growers or to incentivize potential new Growers to move to areas where Integrators have established Complexes." *Id.* ¶ 139; *see also id.* ¶ 86 (describing a new Grower who decided on where to establish a grow-out operation because he believed that would be the area with higher pay).

*Second*, the appropriate geographic market is national if the business operates on a national level, as alleged Co-Conspirators' businesses do, even if certain individual market participants operate on the local level. *E.g.*, *United States v. Grinnell Corp.*, 384 U.S. 563, 575 (1966) (ruling that geographic market for security alarm services was national even though the activities of individual service stations were

---

[24] *See also Todd*, 275 F.3d at 201-02; *In re Se. Milk Antitrust Litig.*, 739 F.3d 262, 277 (6th Cir. 2014) ("Outlining a geographic market entails mapping an area within which the defendant's customers who are affected by the challenged practice can practicably turn to alternative suppliers if the defendant were to raise its prices or restrict its output.") (citation omitted).

local).[25] The CAC alleges that the services demanded of Growers are standardized across the country, CAC

¶¶ 138, 145, 147, the information that is part of the illegal agreement is nationwide, *id.* ¶ 142, and that the

"Integrators, regardless of region of the country, [] impose on Growers near uniform contracts (CFAs)," *id.*

¶ 138. Thus, the CAC alleges a plausible geographic market on its face.

*Third*, Defendants' motion should also be rejected because "market definition is a deeply fact-

intensive inquiry," and thus "courts hesitate to grant motions to dismiss for failure to plead a relevant

product market." *Todd*, 275 F.3d at 199-200 (collecting cases); *see also E.I. du Pont de Nemours & Co. v.*

*Kolon Indus., Inc.*, 637 F.3d 435, 443 (4th Cir. 2011). Further, defining a geographic market as

"nationwide" does not require proof that every Grower would switch to any Integrator in response to

changes in levels of pay. Rather, all that is required is showing that *a sufficient number* of Growers—

whether existing Growers, new entrants, or Growers who intend to expand operations—would be able to

switch in response to changes in pay such that the Co-Conspirators' ability to reduce pay below competitive

levels would be constrained (in a world absent the challenged conduct). *See, e.g.*, *Gumwood HP Shopping*

*Partners, L.P. v. Simon Prop. Grp., Inc.*, No. 3:11-CV-268 JD, 2016 WL 6091244, at *7 (N.D. Ind. Oct.

19, 2016). Defendants' quibbles with the "common sense" of Plaintiffs' market definition, and their

attempts to argue for a different view of the facts, illustrate why courts typically reject such challenges at

the pleading stage.[26]

---

[25] *See also Kamakahi v. Am. Soc. for Reprod. Med.*, No. C 11-01781 SBA, 2013 WL 1768706, at *12 (N.D.
Cal. Mar. 29, 2013) (plaintiffs sufficiently alleged national market where plaintiffs alleged "nationally
coordinated conduct among entities located throughout the United States"); *In re Pool Prod. Distribution
Mkt. Antitrust Litig.*, 940 F. Supp. 2d 367, 381 (E.D. La. 2013) (market for pool products was national
where pricing was set on a national basis, even though individual service centers operated in particular local
markets); *Fed. Trade Comm'n v. Cardinal Health, Inc.*, 12 F. Supp. 2d 34, 50 (D.D.C. 1998) (drug
wholesale market national where pricing in one region affected pricing nationwide, even though some
customers were regional).
[26] *Hanger v. Berkeley Group, Inc.*, No 5:13–cv–113, 2015 WL 3439255, at *10–11 (W.D. Va. May 28,
2015), cited by Defendants, Joint Mot. at 24, is not to the contrary. In that case, plaintiff timeshare
employees pled an "unreasonably narrow" market that included only the defendants—two timeshare
companies in two enclaves in non-contiguous regions of Virginia—and none of their competitors. *Id.* at *9.
The court ruled that "it simply makes no economic sense for plaintiffs to gerrymand a relevant geographic
market exclusively limited to an eighty-five (85) mile area surrounding [defendant's] timeshare resorts in
Massanutten and Williamsburg and ignore, for example, competition posed by timeshare resorts in other

25

*Fourth*, even if the Court were to accept Defendants' efforts to narrow the relevant geographic market, ***it would not matter*** to the legal sufficiency of Plaintiffs' claims. Plaintiffs allege—and Defendants do not dispute—that the Co-Conspirators have 98% market share nationally. Thus, there is no plausible *narrower* geographic market in which the Co-Conspirators do not have sufficient market share from which the Court may infer market power. Defendants do not assert otherwise. Thus, the sufficiency of the claims does not depend on the geographic market definition: Co-Conspirators have market power whether the market is national or broken up into multiple regions.

*Fifth*, as the Supreme Court has made clear, "proof of actual detrimental effects, such as a reduction of output, can obviate the need for an inquiry into market power, which is but a surrogate for detrimental effects." *FTC v. Indiana Fed'n of Dentists*, 476 U.S. 447, 460 (1986); *see also, e.g., Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1434 (9th Cir. 1995); *In re Aggrenox Antitrust Litig.*, 199 F. Supp. 3d 662, 668 (D. Conn. 2016).[27] The CAC contains an entire section devoted to anticompetitive effects, including:

---

parts of Virginia and surrounding areas." *Id.* at *10. Pleading an "unreasonably narrow" market would effectively inflate the alleged market power of the defendants in that case, and thus, drew the court's scrutiny. By contrast, in this case, Plaintiffs have pled a ***broad*** national market that would not inflate the Co-Conspirators' market power. Indeed, as described below, the Co-Conspirators are dominant whether the geographic market is defined broadly or narrowly. Defendants' reliance on *It's My Party, Inc. v. Live Nation, Inc.*, 811 F.3d 676 (4th Cir. 2016), is also misplaced. In *It's My Party*—a case decided on summary judgment—the court rejected a national market for live concert promotion because there was no evidence that those seeking to attend a concert in one city would view a concert in another as a reasonable substitute. *Id.* at 682. By contrast, here, the CAC specifically alleges that "Integrators would consider each other to be competitors for Broiler Grow-Out Services whether Integrators happen to be in the same region or not." CAC ¶ 139.

[27] Defendants assert that the Supreme Court's recent decision in *Ohio v. American Express Co.*, 138 S. Ct. 2274 (2018), requires Plaintiffs to plead a plausible relevant geographic market. Joint Mot. at 22. But *American Express* has limited relevance here. In *American Express*, the Supreme Court stated, in *dicta*, that when plaintiffs allege *vertical* restraints, the court must evaluate whether the defendants have market power through the use of a relevant market, regardless of evidence of anticompetitive effects. *See American Express*, 138 S. Ct. at 2285 n.7. But the court expressly stated that it need not precisely define the relevant market to evaluate allegations of *horizontal* restraints when there is direct evidence of anticompetitive effects. *See id.* The CAC pleads directly an agreement among would-be horizontal competitors to share detailed compensation and other information, and by agreeing to provide confidential business information to Agri Stats in exchange for receiving other Integrators' confidential business information, each Defendant engaged in illicit concerted action. Thus, the relationship between the conspiring Integrators and each other is horizontal. Agri Stats is not a downstream or upstream market participant (such as would be the case in a vertical restraint) but a conduit for the horizontal sharing of information. As Plaintiffs have shown, it elevates form over substance to insulate horizontal competitors from liability merely because they used a

(1) the suppression of Grower compensation below competitive levels, CAC ¶ 141; (2) a reduced intensity of price competition, *id.* ¶ 143; (3) the discouragement of new Integrators from moving into areas with only a single Integrator, *id.* ¶ 145; and (4) a reduced output of Broilers available for sale on the retail market, which artificially inflates prices and restricts choice, *id.* ¶ 149; *see generally id.* ¶¶ 141-57. Plaintiffs support these allegations with DOJ Guidance, economic theory, and information about the Broiler Grow-Out Industry. *E.g.*, CAC ¶¶ 143, 144, 146, 148-49. Defendants' challenge to these allegations fails.[28]

## B. Defendants Misstate the Standards Governing Plaintiffs' Well-Pled PSA Claim

Defendants say little about Plaintiffs' PSA claim, arguing chiefly that Plaintiffs' Section 1 and PSA claims "are analytically similar" to one another and as such, the two claims must rise or fall together. Joint Mot. at 27. That is partly right. Like Section 1, Sections 192(f) and (g) of "[t]he PSA ha[ve] been used over the years to stop collusive activity among competing entities." *Griffin v. Smithfield Foods, Inc.*, 183 F. Supp. 2d 824, 827 (E.D. Va. 2002). As to those two sections of the PSA, Defendants simply reiterate the faulty arguments raised against Plaintiffs' Sherman Act claim. Joint Mot. at 27 (the PSA claim "must be dismissed" because "Plaintiffs fail to plead any anticompetitive agreement" under Section 1). Thus, if Defendants' Section 1 arguments fail, their PSA arguments will fail against the essentially identical allegations supporting the analytically similar PSA claims.

But even if Plaintiffs' Section 1 claim fails, the PSA claim need not suffer the same fate. This is because the PSA, unlike Section 1, does not require proof of an adverse effect on competition. Indeed,

---

third-party conduit (here, Agri Stats) to effectuate the conspiracy.

[28] Defendants assert that these allegations are "vague and conclusory" because, while Plaintiffs' allege a "downward trend" in Grower pay, Plaintiffs do not allege details showing that this has pushed pay below "below competitive levels." Joint Mot. at 25 (citing *Twombly*, 550 U.S. at 555). This is wrong. The CAC alleges that the Co-Conspirators, through the Scheme, had the power to, and did, suppress Grower pay to below competitive levels. *E.g.*, CAC ¶¶ 140, 141, 143, 148, 154, 170. The question of how far the pay was suppressed below competitive levels is a fact-intensive question that will likely require the input from economic experts, and it is not appropriate to answer at the pleading stage. Additionally, Defendants overstate *Twombly*, which holds that "heightened fact pleading of specifics" is not required to plead an antitrust conspiracy. *Twombly*, 550 U.S. at 570. Indeed, "[a]sking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal agreement." *Id.* at 556; *see also Milliken*, 2011 WL 3444013, at *2. Defendants' attacks on Plaintiffs' rule of reason allegations fail.

27

Defendants misstate the law when they claim that Plaintiffs *must* "plead an 'adverse[]' effect on competition" for their PSA claim to survive. Joint Mot. at 27. As Defendants' own authorities clearly state, the PSA's broad mandate stops short of requiring *actual* harm to competition (as the Sherman Act requires) for a plaintiff to recover its damages, *Philson v. Cold Creek Farms, Inc.*, 947 F. Supp. 197, 200 (E.D.N.C. 1996), requiring only the lesser showing that the challenged "conduct was *likely* to affect competition adversely," *Philson v. Goldsboro Mill Co.*, 164 F.3d 625 (4th Cir. 1998) (emphasis added) (cited in Joint Mot. at 27); *Been v. O.K. Industries, Inc.*, 495 F.3d 1217, 1228, 1230 (10th Cir. 2007) (the PSA is "intended to be broader than antecedent antitrust legislation" such as the Sherman Act and requires only proof that challenged conduct is "likely to injure competition"). As discussed above, Plaintiffs have pled facts demonstrating actual adverse effects on competition, and those facts most certainly satisfy the lesser standard that the alleged facts are *likely* to cause an adverse effect on competition. *See* Section IV(A)(5), *supra*; *see also Goldsboro*, 164 F.3d 365 ("[T]he purpose of the Act is to halt unfair trade practices in their incipiency") (internal citation and quotation marks omitted).

Defendants also contend that a separate section of the PSA—Section 192(a)—"is not a conspiracy provision" such that the (purported) failure to allege specific individual actions by Koch and Sanderson is fatal to the claim. Joint Mot. at 27. This is wrong. First, Section 192(a) reaches concerted action because Section 192(g) makes it unlawful to conspire to perform a practice that is unlawful under Section 192(a). 7 U.S.C. § 197(g). Second, it is undisputed that Koch and Sanderson each agreed to share information with their Co-Conspirators through Agri Stats, and participation in that program has supported a plaintiffs' verdict in federal district court under Section 192(a). *Been v. O.K. Industries, Inc.*, 398 Fed. Appx. 382, 386, 396 (10th Cir. 2010) (jury "return[ed] a verdict, finding that [defendant] violated § [192](a)" on claim that it "shared detailed information with other integrators in the form of 'Agri Stats,' but did not share this information with the Growers, leading to a severe asymmetry of information," which plaintiffs' claimed "depressed Grower pay compared to competitive-market levels," finding no error in admission of expert testimony concerning information asymmetry). And in any event, as discussed above, Plaintiffs have sufficiently pled facts showing Sanderson and Koch's involvement in a scheme to manipulate Grower pay.

28

*See* Sections II(D), IV(A)(4), *supra*.

**C. Defendants Improperly Invoke the First-Filed Rule**

Defendants ask the Court to dismiss this action "in favor of the earlier-filed Oklahoma action," Joint Mot. at 28, a case from which Defendants sought and obtained dismissal on personal jurisdiction grounds. *See* Ex. 2 (Oklahoma court's ruling on Defendants' 12(b)(2) motion); *see also* Ex. 3 (transcript of defense counsel's argument to the Judicial Panel on Multidistrict Litigation refusing to consent to transfer under 28 U.S.C. 1404). Defendants claim this case falls under the "first-filed rule"—a doctrine that guides courts in "choosing between possible venues" to adjudicate a controversy and gives priority to the court that "first establishes jurisdiction" over the parties. *Nutrition & Fitness, Inc. v. Progressive Emu, Inc.*, No. 5:12-cv-192, 2012 WL 2062299, at *2 (E.D.N.C. June 7, 2012). Defendants are not, then, invoking the rule for its intended purpose to help *choose* between *possible venues*, but instead attempt to use the rule as a *bar* to Plaintiffs' claims against them in *any venue*. This argument has no merit.

The touchstone for application of the first filed rule is that two potential venues be just that—actual potential venues to adjudicate the controversy between the parties—and thus the "rule applies ***only*** in cases of ***concurrent jurisdiction***." *Beach Mart, Inc. v. L & L Wings, Inc.*, No. 2:11-cv-44, 2014 WL 1365708, at *3 (E.D.N.C. Apr. 7, 2014) (emphases added) (collecting cases). For this reason, in *Beach Mart*, Judge Fox held that he "cannot enjoin" a later filed action where there are "outstanding questions" as to whether one defendant is "subject to personal jurisdiction" in the earlier filed case. *Id.* (citing *Buffalo Wild Wings, Inc. v. BWR McAllen, Inc.*, No. 10-cv-1265, 2010 WL 26420122, at *2 (S.D. Tex. June 30, 2010) (denying application of first-filed rule where some parties could not be joined in first action because first court lacked jurisdiction over those parties) (parenthetical in *Beach Mart*)).

And as this Court has stated, the first filed rule applies where "the ***same parties*** and issues are already ***before another district***." *Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*, No. 5:09-cv-433, 2010 WL 11561770, at *1 (E.D.N.C. Mar. 1, 2010) (Dever, J.) (emphases added) (dismissing in favor of earlier action where "there is no evidence that the dispute cannot be fully adjudicated" in the earlier action and "[a]ll the issues are, or can be, . . . joined" in earlier action) (internal citation omitted, alteration

in original). Here, there are not just "outstanding questions" about the lack of concurrent jurisdiction and Plaintiffs' ability to recover against these Defendants in the earlier filed action. Judge Shelby has already answered those questions, ruling that the Oklahoma court has no jurisdiction over Defendants.[29] Were Defendants allowed to invoke that rule to dismiss this action, they would get off scot-free. (Indeed, if the first-filed rule applied as Defendants suggest, any dismissal on personal jurisdiction grounds of less than all defendants in an action would logically be dismissal with prejudice.) None of Defendants' cases authorizes, let alone compels, such an application of the first filed rule.[30] And even if they did, the "balance of convenience" certainly does not tilt in favor of immunizing Defendants from accountability for the harm they caused. *See Ellicott Mach. Corp. v. Modern Welding Co.*, 502 F.2d 178, 180 n.2 (4th Cir. 1974) (the rule does not apply if the "balance of convenience" favors the later action).

## V. CONCLUSION

Defendants' Motion should be denied.

---

[29] True, "precise identity of parties is not required for application of the first-filed rule." *Beach Mart*, 2014 WL 1365708, at *5. But this does not obviate the requirement of concurrent jurisdiction; because of that requirement, mere "uncertainty regarding the first-filed court's jurisdiction over the parties in the second-filed action counsels against application of the rule." *Id.* Here, there is not mere uncertainty as to the earlier action's jurisdiction over Defendants; Judge Shelby has already ruled that there is none.

[30] *U.S. ex rel. Szymoniak v. ACE Sec. Corp.*, cited by Defendants, Joint Mot. at 29, is inapposite as it involved the **legally distinct statutory first-to-file provision** of the False Claims Act, which unlike the separate and flexible judicially created legal doctrine is an "absolute, unambiguous [and] exception-free" rule because only the first filer with original information can be a Relator in a *qui tam* action. No. 13-cv-464, 2014 WL 1910876, at *3-*4 (D.S.C. May 12, 2014) (involving statutory "FAC's first-to-file rule" found at 31 U.S.C. § 3730(b)(5)). In *St. Paul Fire & Marine Ins. Co. v. Renne Acquisitions Corp.*, Joint Mot. at 28, there was no suggestion that the movant was not subject to jurisdiction in the earlier filed action; instead that case concerned a retaliatory lawsuit filed by the movant (the defendant in an earlier filed) action against the plaintiff in an earlier filed action in an attempt to forum shop rather than file a counterclaim in the first action. No. 3:09CV476-RJC-DSC, 2010 WL 2465543, at *2-*3 (W.D.N.C. June 14, 2010). *Harleysville Mut. Ins. Co. v. Hartford Cas. Ins. Co.*, Joint Mot. at 28, presented identical circumstances as those in *St. Paul Fire*. No. 7:11-cv-187, 2012 WL 1825331, at *4 (E.D.N.C. May 18, 2012). *Volvo Const. Equipment North America, Inc. v. CLM Equipment Company, Inc.*, Joint Mot. at 28, is on all fours with both *St. Paul Fire* and *Harleysville*. 386 F.3d 581, 589-90 (4th Cir. 2004). And *Worthington v. Bayer Healthcare*, Joint Mot. at 28, an unpublished out-of-circuit district court opinion, involved three copy-cat class actions filed against a **single defendant**, where an identical earlier class action was already pending against that **same defendant** in California, and there were no concerns that the California court lacked either jurisdiction over that defendant or the ability to fully adjudicate all issues and award complete relief as to the entire class. No. 11-cv-2793, 2012 WL 1079716, at *3-*6 (D.N.J. Mar. 30, 2012).

Dated: August 13, 2018

/s/ David M. Wilkerson
Larry S. McDevitt, Bar No. 5032
David M. Wilkerson, Bar No. 35742
THE VAN WINKLE LAW FIRM
11 N. Market Street
Asheville, NC 28801
Tele: (828) 258-2991
Fax: (828) 257-2767
Email: lmcdevitt@vwlawfirm.com
Email: dwilkerson@vwlawfirm.com

*Additional Class Counsel for Plaintiffs and the
Proposed Class*

Michael D. Hausfeld**
James J. Pizzirusso**
Melinda R. Coolidge*
Samantha S. Derksen*
HAUSFELD LLP
1700 K Street, NW
Washington, DC 20006
Tele: (202) 540-7200
Fax: (202) 540-7201
Email: mhausfeld@hausfeld.com
Email: jpizzirusso@hausfeld.com
Email: mcoolidge@hausfeld.com
Email: sderksen@hausfeld.com

Gary I. Smith, Jr.*
HAUSFELD LLP
325 Chestnut St., Suite 325
Philadelphia, PA 19106
Tele: (215) 985-3270
Fax: (215) 985-3271
Email: gsmith@hausfeld.com

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Eric L. Cramer*
Patrick F. Madden*
Christina Black*
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, PA 19103
Tele: (215) 875-3000
Fax: (215) 875-4604
Email: ecramer@bm.net
Email: pmadden@bm.net
Email: cblack@bm.net

31

Daniel J. Walker*
BERGER & MONTAGUE, P.C.
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006
Telephone: (202) 559-9745
Email: dwalker@bm.net

*Co-Lead Counsel for Plaintiffs and the Proposed Class*

Vincent J. Esades*
HEINS MILLS & OLSON, PLC
310 Clifton Avenue
Minneapolis, MN 55403
Tele: (612) 338-4605
Fax: (612) 338-4692
Email: vesades@heinsmills.com

Warren T. Burns**
BURNS CHAREST LLP
500 North Akard, Suite 2810
Dallas, Texas 75201
Tele: (469) 904-4551
Email: wburns@burnscharest.com

Gregory Davis**
DAVIS & TALIAFERRO, LLC
7031 Halcyon Park Drive
Montgomery, AL 36117
Tele: (334) 832-9080
Fax: (334) 409-7001
Email: gldavis@knology.net

Charles D. Gabriel**
CHALMERS, BURCH & ADAMS, LLC
North Fulton Satellite Office
5755 North Point Parkway, Suite 251
Alpharetta, GA 30022
Tele: (678) 735.5903
Fax: (678) 735.5905
Email: cdgabriel@cpblawgroup.com

Harlan Hentges**
HENTGES & ASSOCIATES, PLLC
102 Thatcher Street
Edmond, OK 73034
Tel: (405) 340-6554
Fax: (405) 340-6562

John C. Whitfield**
Caroline Taylor**

32

WHITFIELD BRYSON & MASON LLP
19 North Main Street
Madisonville, KY 42431
Tel: (270) 821-0656
john@wbmllp.com
caroline@wbmllp.com

Gary E. Mason*
Jennifer S. Goldstein*
WHITFIELD BRYSON & MASON LLP
5101 Wisconsin Ave., NW
Ste. 305
Washington, DC 20036
Tel: (202) 429-2290
Fax: (202) 429-2294
gmason@wbmllp.com
jgoldstein@wbmllp.com

J. Dudley Butler*
BUTLER FARM & RANGE LAW GROUP, PLLC
499-A Breakwater Dr.
Benton, MS 39039
Tel.: (662) 673-0091
Fax: (662) 673-0091
jdb@farmandranchlaw.com

Daniel M. Cohen*
CUNEO GILBERT & LADUCA, LLP
4725 Wisconsin Ave., NW
Suite 200
Washington, DC 20016
Tel: (202)789-3960
Fax: (202)789-1813
Danielc@cuneolaw.com

David S. Muraskin**
PUBLIC JUSTICE, PC
1620 L St. NW, Suite 630
Washington, DC 20036
Tel: (202) 861-5245
Fax: (202) 232-7203
dmuraskin@publicjustice.net

M. David Riggs**
Donald M Bingham**
RIGGS ABNEY NEAL TURPEN ORBISON & LEWIS
502 W. Sixth St.
Tulsa, OK 74119
Tel: (918) 699-8914
Fax: (918) 587-9708
driggs@riggsabney.com

33

don_bingham@riggsabney.com

Hollis Salzman**
Kellie Lerner**
ROBINS KAPLAN LLP
99 Park Avenue, Suite 3600
New York, NY 10022
Telephone: (212) 980-7400
Facsimile: (212) 980-7499
HSalzman@RobinsKaplan.com
KLerner@RobinsKaplan.com

Aaron Sheanin**
ROBINS KAPLAN LLP
2440 W. El Camino Real
Suite 100
Mountain View, CA 94040
Telephone: (650) 784-4040
Facsimile: (650) 784-4041
ASheanin@RobinsKaplan.com

M. Stephen Dampier**
LAW OFFICES OF M. STEPHEN DAMPIER, P.C.
55 N. Section St.
P.O. Box 161
Fairhope, AL 36532
Telephone: (251) 929-0900
Facsimile: (251) 929-0800
dampier.steve@gmail.com


*Additional Class Counsel for Plaintiffs and the Proposed Class*


*\* Appearing Specially*

*\*\* Notice of Special Appearance forthcoming*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the 13 day of August, 2018, I electronically filed the foregoing Plaintiffs' Memorandum of Law in Opposition to Defendant's Joint Motion to Dismiss Under Federal Rule of Civil Procedure 12(b)(6) with the Clerk of Court using the CM/ECF System, which will send notification via electronic means to the attorneys of record at that time.

Cable M. Frost                              cfrost@bakerdonelson.com

Jessica L. Willson                           jess.green@smithmoorelaw.com

Matthew Nis Leerberg                   matt.leerberg@smithmoorelaw.com

Samuel D. Gregory                         sdgregory@bakerdonelson.com

Scott W. Pedigo                           spedigo@bakerdonelson.com

Erik R. Zimmerman                      ezimmerman@robinsonbradshaw.com

Christa C. Cottrell                         ccottrell@kirkland.com

Daniel E. Layton                          dlayton@kirkland.com

Martin L. Roth                            rothm@kirkland.com

Stacy L. Pepper                           stacy.pepper@kirkland.com

THIS 13th day of August, 2018.

/s/ David Wilkerson
David Wilkerson