# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## SOUTHERN DIVISION

| | |
|---|---|
| IN RE: SANDERSON AND KOCH BROILER CHICKEN GROWER LITIGATION | No. 7:18-cv-00031-D

The Honorable Chief Judge James C. Dever III |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR JOINT MOTION TO DISMISS
### <u>UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)</u>

# TABLE OF CONTENTS

                                                                              **Page**

TABLE OF AUTHORITIES ........................................................................................ii

INTRODUCTION ................................................................................................... 1

ARGUMENT .......................................................................................................... 2

I.      Claiming an "Overarching" Conspiracy Does Not Alter the Pleading Standard................ 2

II.     Plaintiffs Do Not Allege a Plausible "No Poach" Agreement. .......................................... 4

III.    Plaintiffs' Information Sharing Allegations Fail. ............................................................. 7

        A.      Plaintiffs Have Not Pled a Horizontal Agreement to Exchange Information.
                ..................................................................................................................... 7

        B.      Plaintiffs Cannot State A Claim Under the Rule of Reason. ............................... 10

                1.      Plaintiffs' Nationwide Market Is Unsupported and Implausible. ............. 10

                2.      Plaintiffs Fail to Allege an Anticompetitive Effect on Grower Pay. ........ 13

IV.     Plaintiffs' PSA Claim Should Be Dismissed. ................................................................ 14

V.      Plaintiffs Cannot Avoid the Application of the First-Filed Rule. .................................... 15

CONCLUSION..................................................................................................... 15

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Column and Lumber Co. v. United States*,
257 U.S. 377 (1921) ...........................................................................................................8

*ATC Healthcare Servs., Inc. v. RCM Techs., Inc.*,
192 F. Supp. 3d 943 (N.D. Ill. 2016) ................................................................................6

*B & R Supermarket, Inc. v. Visa, Inc.*,
2016 WL 5725010 (N.D. Cal. Sept. 30, 2016) .................................................................6

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
166 F. Supp. 3d 988 (N.D. Cal. 2015) .............................................................................10

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) ...........................................................................................................6

*Berlyn, Inc. v. Gazette Newspapers, Inc.*,
223 F. Supp. 2d 718 (D. Md. 2002) .................................................................................12

*Brown Shoe Co. v. United States*,
370 U.S. 294 (1962) .........................................................................................................13

*Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*,
846 F.3d 1297 (10th Cir. 2017) .......................................................................................14

*Cal. Dental Ass'n v. FTC*,
526 U.S. 756 (1999) .........................................................................................................14

*Continental Ore Co. v. Union Carbide & Carbon Corp.*,
370 U.S. 690 (1962) ...........................................................................................................3

*Farrow v. U.S. Dep't of Agric.*,
760 F.2d 211 (8th Cir. 1985) ...........................................................................................14

*FTC v. Indiana Fed'n of Dentists ("IFD")*,
476 U.S. 447 (1986) .........................................................................................................14

*Hanger v. Berkley Grp., Inc.*,
2015 WL 3439255 (W.D. Va. May 28, 2015) .................................................................12

*Heerwagen v. Clear Channel Commc'ns*,
435 F.3d 219 (2d Cir. 2006) ............................................................................................11

*IBP, Inc. v. Glickman,*
  187 F.3d 974 (8th Cir. 1999) ...........................................................................14

*In re Animation Workers Antitrust Litig.,*
  123 F. Supp. 3d 1175 (N.D. Cal. 2015) ..............................................................5

*In re Automotive Parts Antitrust Litigation,*
  29 F. Supp. 3d 982 (E.D. Mich. 2014)................................................................6

*In re Cathode Ray Tube (CRT) Antitrust Litig.,*
  738 F. Supp. 2d 1011 (N.D. Cal. 2010) ..............................................................5

*In re Dental Supplies Antitrust Litig.,*
  2016 WL 5415681 (E.D.N.Y. Sept. 28, 2016) ....................................................5

*In re High-Tech Emp. Antitrust Litig.,*
  856 F. Supp. 2d 1103 (N.D. Cal. 2012) ...........................................................5, 6

*In re Musical Instruments and Equip. Antitrust Litig.,*
  798 F.3d 1186 (9th Cir. 2015) ..........................................................................6, 7

*In re Processed Egg Products Antitrust Litigation,*
  206 F. Supp. 3d 1033 (E.D. Pa. 2016) ..............................................................2, 3

*In re Static Random Access Memory (SRAM) Antitrust Litig.,*
  580 F. Supp. 2d 896 (N.D. Cal. 2008) ..............................................................5, 8

*Lantec, Inc. v. Novell, Inc.,*
  306 F.3d 1003 (10th Cir. 2002) .........................................................................11

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.,*
  551 U.S. 877 (2007)...........................................................................................2

*Milliken & Co. v. CNA Holdings, Inc.,*
  2011 WL 3444013 (W.D.N.C. Aug. 8, 2011)......................................................3

*Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.,*
  889 F.2d 524 (4th Cir. 1989) .............................................................................12

*Procaps S.A. v. Patheon, Inc.,*
  845 F.3d 1072 (11th Cir. 2016) .........................................................................14

*Prosterman v. Am. Airlines, Inc.,*
  2016 WL 7157667 (N.D. Cal. Dec. 8, 2016).......................................................13

*Republic Tobacco Co. v. N. Atl. Trading Co.,*
  381 F.3d 717 (7th Cir. 2004) .............................................................................14

*SD3, LLC v. Black & Decker (U.S.) Inc.*,
    801 F.3d 412 (4th Cir. 2015) ............................................................................4, 13

*Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*,
    713 F. Supp. 937 (E.D. Va. 1989), *aff'd*, 903 F.2d 988 (4th Cir. 1990)..................................10

*Texaco, Inc. v. Dagher*,
    547 U.S. 1 (2006)...................................................................................................10

*Todd v. Exxon*,
    275 F.3d 191 (2d Cir. 2001)............................................................................8, 11

*United States v. American Linseed Oil*,
    262 U.S. 371 (1923)..................................................................................................9

*United States v. Container Corp. of America*,
    393 U.S. 333 (1969).................................................................................................8

*Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*,
    2010 WL 11561770 (E.D.N.C. Mar. 1, 2010) (Dever, J.) ........................................15

*Wheeler v. Pilgrim's Pride Corp.*,
    246 F.R.D. 532 (E.D. Tex. 2007)............................................................................11

**Rules**

Fed. R. Civ. P. 12(b)(6)..................................................................................................2

# INTRODUCTION

Plaintiffs' response confuses the governing legal frameworks, ignores key authorities, and, where it matters most, rests on conclusory allegations and unsupported suppositions. The Court should dismiss the Complaint, because the pleading deficiencies identified in Defendants' Motion remain.

*First*, Plaintiffs cannot use the label "overarching conspiracy" to convert two separately alleged agreements into one *per se* claim. Courts have consistently rejected similar attempts.

*Second*, Plaintiffs fail to adequately plead a no-poach agreement. Despite conceding that Growers operate in localized markets and face high entry and exit costs, Plaintiffs assert that low switching rates must be the result of some "unwritten pact." (Opp. at 22.) But they offer only speculative hearsay about the actions of *non-party producers*. They do not sufficiently allege either direct or circumstantial evidence of a conspiracy *by Defendants*, as required by settled law.

*Third*, Plaintiffs' information sharing agreement fares no better. Plaintiffs contend that they need only plead that Defendants joined Agri Stats because, "[a]bsent mutual agreement," the service would have been "worthless." (Opp. at 12.) That is not the law. As the cases cited by Plaintiffs make clear, courts require allegations showing that defendants *agreed with each other* to exchange information—not that they merely sent data to a third party. Further, despite now conceding that the rule of reason applies to an information exchange, (Opp. at 10), Plaintiffs neither plead their claim under the rule of reason nor satisfy it. Their factual allegations of the localized nature of Grower services are at odds with, and render implausible, their proposed *nationwide* relevant market, and they do not sufficiently allege anticompetitive effects.

*Fourth*, Plaintiffs PSA claim must fall with their Sherman Act claim. They have not alleged plausible agreements or anticompetitive effects.

*Fifth*, the case should alternatively be dismissed pursuant to the first-filed rule.

## ARGUMENT

**I.    Claiming an "Overarching" Conspiracy Does Not Alter the Pleading Standard.**

Plaintiffs conflate the separately alleged information sharing and no-poach agreements into an "overarching" conspiracy in an attempt to insulate the Complaint from judicial review under Rule 12(b)(6). This attempt fails as a matter of law and under the facts.

*First*, Plaintiffs plead no facts supporting an overarching scheme, instead offering a bare conclusion that one exists. In fact, the Complaint breaks out the two supposed agreements separately, with no overlapping direct or circumstantial allegations suggesting that the purported agreements compose one-and-the same conspiracy. Indeed, Plaintiffs' position does not make legal (or factual) sense. Plaintiffs provide no suggestion for how the Court should even evaluate a "[c]onspiracy involving two agreements" as a single overarching conspiracy. (Opp. at 5.) Two defective parts cannot make a plausible whole.

*Second*, the law is clear: each alleged agreement must be analyzed separately. Plaintiffs do not address *In re Processed Egg Products Antitrust Litigation*, which is on point. That decision rejected a similar attempt to treat the defendants' participation in an egg-certification program—a prototypical rule-of-reason practice—as *per se* illegal by calling the program part of an "overarching conspiracy" to cut egg supply. 206 F. Supp. 3d 1033, 1037–40 (E.D. Pa. 2016). As the court explained, using the label "single, overarching conspiracy" is not license to "suck[]" conduct usually evaluated under the rule of reason "into a *per se* analysis." *Id.* at 1040. And even entertaining Plaintiffs' attempt to couch the purported information exchange as a "facilitating practice" for some larger price-fixing agreement, (Opp. at 9), the *per se* rule *still* would not apply. *See Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 893 (2007) (recognizing that even where horizontal cartel is properly pled as *per se* unlawful, separate agreement alleged to "facilitate" the cartel "would need to be held unlawful under the rule of reason" if that restraint is

not one that always tends to restrict competition and decrease output).  In short, Plaintiffs cannot fit this square peg (rule-of-reason conduct) into a round hole (*per se* treatment).

None of Plaintiffs' cited authorities concerning allegation compartmentalization is to the contrary.  (*See* Opp. at 9–10.)  The cases stand only for the uncontroversial principle that courts should not (i) treat a conspiracy claim against multiple defendants as if it constitutes multiple distinct lawsuits or (ii) assess plus-factor allegations myopically.  Plaintiffs primarily rely on *Continental Ore Co. v. Union Carbide & Carbon Corp.*, which stated that "[t]he character and effect of a conspiracy are not to be judged by dismembering it and viewing its separate parts, but only by looking at it as a whole."  370 U.S. 690, 699 (1962) (quoted in Opp. at 9).  But Plaintiffs omit the critical context in that case:  it was "apparent from" the record "that the Court of Appeals approached [plaintiff's conspiracy] claims [against five defendants] as if they were *five completely separate and unrelated lawsuits*."  *Id.* at 698–99.[1]  Likewise, in *Milliken & Co. v. CNA Holdings, Inc.*, the court only rejected the defendants' suggestion that it should "analyze each *allegation* separately" when the defendants attempted to parse the relevance of various guilty pleas and an admission of guilt concerning the same alleged conspiracy.  2011 WL 3444013, at *10 (W.D.N.C. Aug. 8, 2011) (cited in Opp. at 10).[2]

In sum, Plaintiffs' cases do not address the proper legal standard for analyzing two separately pled agreements.  The *per se* standard governs one (no-poach), the rule of reason the other (information sharing).  Nothing prohibits assessing each, in turn.

---

[1] As the *Egg Products* court explained, "*Continental Ore* was not intended to limit a court's individual assessment of the legality of various components of an alleged conspiracy."  206 F. Supp. 3d at 1041.

[2] Plaintiffs also cite an excerpt from a hearing before Judge Shelby in the parallel Oklahoma litigation.  (*See* Opp. at 10 n.14.)  But in discussing Plaintiffs' "single count for agreement in restraint of trade," Judge Shelby was considering whether Plaintiff's *claim* could proceed if the information-exchange agreement alone was plausibly alleged.  *See* Ex. A, Hr'g Tr. at 39:22–25, 40:14–16, 41:3–7, 41:17–22, 45:1–13.  He was not suggesting that Plaintiffs had alleged a plausible *overarching* conspiracy.

3

## II.     Plaintiffs Do Not Allege a Plausible "No Poach" Agreement.

Plaintiffs argue that the Complaint pleads a plausible no-poach agreement "with four types of allegations": (i) "direct evidence;" (ii) "circumstantial evidence;" (iii) "industry structure;" and (iv) allegations that the purported information sharing agreement is a "facilitating practice." (Opp. at 20.) Not only are the latter two "types" facets of their circumstantial case, as opposed to independent bases for inferring agreement, but Plaintiffs have not adequately pled a no-poach theory either directly or circumstantially.

*First*, Plaintiffs' purported "direct evidence" fails. They make no attempt to rebut Defendants' arguments and authorities demonstrating that none of the Complaint's general, speculative anecdotes qualifies as direct evidence of a conspiracy involving Koch or Sanderson. (*See* Dkt. 53 ("Mot.") at 7–8.) Instead, they simply assert the contrary. (Opp. at 20.) The fact remains that Plaintiffs point to no evidence of a direct conspiracy, and no relevant conduct at all by Defendants.

*Second*, Plaintiffs cannot make out a circumstantial case either. Plaintiffs do not refute Defendants' observation that the Complaint does not plead parallel conduct by Koch and Sanderson relative to Grower hiring. (Mot. at 9.) Instead, Plaintiffs eschew any discussion of "parallel conduct" and rest on (i) their perception that there is not *enough* Grower switching and (ii) generic "plus factors" relating to industry characteristics they believe somehow support an inference that conspiracy explains the former. (Opp. at 21–23.) Neither suffices.

Plaintiffs fail the parallel-conduct requirement at the outset because the Complaint contains no allegations of Koch's or Sanderson's hiring at all. Plaintiffs ignore Defendants' authorities holding that such allegations are mandatory to plead their implication in a conspiracy. *See, e.g.*, *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015) ("[T]he complaint must 'specify how these defendants [were] involved in the alleged conspiracy,' without relying on

4

'indeterminate assertions' against all 'defendants.'")).[3]  Further, Plaintiffs concede that switching *does* occur (Opp. at 20), which plausibly suggests neither that *Defendants* have declined to hire other producers' Growers nor that they have done so in parallel.  The Complaint cites an unspecified study from 1999 and industry averages for a single year, (Compl. ¶¶ 89–91), but does not allege that switching decreased after an unlawful agreement was reached.  In denying that they are required to do so and asserting that such allegations are only "examples," Plaintiffs only highlight their failure to allege any parallel conduct with respect to Grower hiring and the lack of case support for their position.  (Opp. at 21.)  This failure is in stark contrast to the cases Plaintiffs cite, (Opp. at 22), each of which alleged specific agreements reached between defendants' identified employees on specific dates.[4]

Plaintiffs' circumstantial case is also undermined by the "obvious alternative explanation" that their own Complaint suggests:  high switching costs occasioned by producer-specific housing and equipment as well as inherent geographic constraints on production networks.  (*See* Mot. at 11–12.)  Plaintiffs concede these natural barriers to switching, but contend they somehow make a *conspiracy* to limit switching *more* likely.  Simply put, Plaintiffs are *assuming* a conspiracy exists

---

[3] The cases Plaintiffs cite in response, (Opp. at 22), actually prove Defendants' point.  Both included allegations of *each defendant's* participation in the alleged conspiracy.  *See In re Cathode Ray Tube (CRT) Antitrust Litig.*, 738 F. Supp. 2d 1011, 1019 (N.D. Cal. 2010) (complaints "contain[ed] allegations concerning specific Defendants' participation in [at least 500] alleged unlawful meetings and agreements"); *In re Static Random Access Memory (SRAM) Antitrust Litig.*, 580 F. Supp. 2d 896, 901–04 (N.D. Cal. 2008) (explaining that plaintiffs "need to make allegations that plausibly suggest that each Defendant participated in the alleged conspiracy," and concluding that they had through "a number of specific allegations of communications," including emails "between Defendant companies").

[4] *See In re Dental Supplies Antitrust Litig.*, 2016 WL 5415681, at *2 (E.D.N.Y. Sept. 28, 2016) (citing messages exchanged between defendants in February and March 2012 explicitly reflecting no-poach agreement); *In re High-Tech Emp. Antitrust Litig.*, 856 F. Supp. 2d 1103, 1118–20 (N.D. Cal. 2012) (noting that defendants contemporaneously entered into six nearly identical bilateral agreements on specific dates not to poach each other's employees, further supported by three underlying guilty pleas to criminal antitrust violations); *In re Animation Workers Antitrust Litig.*, 123 F. Supp. 3d 1175, 1181–84 (N.D. Cal. 2015) (related action to *High-Tech* also including allegations of specific meetings and communications reflecting no-poach agreement).

when they themselves plead ample reason that none does.[5]  Plaintiffs then backpedal, suggesting

that analysis of the obvious alternative explanation that they pled should await discovery.  (Opp.

at 21.)  But, under *Twombly*, Plaintiffs cannot ignore the obvious and survive dismissal.  *See Bell*

*Atlantic Corp. v. Twombly*, 550 U.S. 544, 567–68 (2007) (ordering dismissal without discovery

where "complaint itself g[ave] reasons to believe" that firms would not incur costs of switching

from one market to another where barriers to entry were present).

Finally, Plaintiffs cannot state a claim based on circumstantial evidence because they do

not sufficiently plead "plus factors."  Plaintiffs' first attempted plus factor—opportunities to

collude at trade-association events—adds nothing to the plausibility of their claim.  *See In re*

*Musical Instruments and Equip. Antitrust Litig.*, 798 F.3d 1186, 1196 (9th Cir. 2015) ("Mere

participation in trade-organization meetings where information is exchanged and strategies are

advocated does not suggest an illegal agreement.").  In contrast to the cases on which Plaintiffs

rely, (Opp. at 23), the Complaint's recitation of industry meetings occurring years into the alleged

conspiracy period contains nothing suggestive of an actual agreement, such as collusive

communications at the meetings or a suspicious change in behavior afterwards.[6]

Plaintiffs' second alleged plus factor—occasional movement of high-level employees

between companies—actually typifies *competitive* behavior.  *See ATC Healthcare Servs., Inc. v.*

---

[5] Plaintiffs' citation to *In re Automotive Parts Antitrust Litigation* is inapposite.  (Opp. at 20–21).  The allegations in that case were enhanced by numerous guilty pleas to parallel criminal charges that "create[d] an inference of an expansive industry-wide component parts conspiracy," and high barriers to enter market as a seller (not buyer) of automotive parts simply provided context making it more likely that defendant *sellers* (not victim buyers) conspired.  29 F. Supp. 3d 982, 996 (E.D. Mich. 2014).

[6] *See B & R Supermarket, Inc. v. Visa, Inc.*, 2016 WL 5725010, at *7 (N.D. Cal. Sept. 30, 2016) (recognizing that "mere participation in trade-organization meetings does not alone suggest an illegal agreement," but deeming such activities a plus factor because plaintiffs connected a specific collusive statement at a meeting to an abrupt, unanimous change in behavior that "departed from the preexisting pattern"); *High-Tech*, 856 F. Supp. 2d at 1119 (conspiracy evidence bolstered by allegations that relevant senior executives *sat on each other's boards* when "virtually identical, but secret" bilateral agreements were reached).

6

*RCM Techs., Inc.*, 192 F. Supp. 3d 943, 957 (N.D. Ill. 2016) ("Hiring a competitor's employees is an ordinary part of competition, and indeed is inherent in any successful economic system."). Plaintiffs do not dispute this, but rather, assert that a purported lack of non-compete or confidentiality limitations somehow displaces this principle. (Opp. at 23.) Plaintiffs cite no case suggesting it does, nor do they suggest this is anomalous for the industry or connect it to Grower hiring or benchmarking. This leaves Plaintiffs with generic allegations about industry structure and history, which do not make a conspiracy more plausible. (*See* Mot. at 13.)

Nor do Plaintiffs plead information sharing as a "facilitating practice" plus factor from which a no-poach agreement can be inferred. (Opp. at 9.) If a no-poach agreement existed, there would be no need for information sharing or compensation monitoring to limit Growers' "incentive" to switch. (Opp. at 9.) Put differently, having an incentive to act (or lack thereof) is meaningless without the *ability* to act—which a no-poach agreement would achieve all on its own. Plaintiffs fail to explain this inconsistency and allege no facts supporting an inference of a no-poach agreement from Defendants' alleged use of Agri Stats.

## III. Plaintiffs' Information Sharing Allegations Fail.

### A. Plaintiffs Have Not Pled a Horizontal Agreement to Exchange Information.

Under clear precedent, Plaintiffs must allege that Defendants agreed to share information *with each other*—not merely with Agri Stats. Plaintiffs' response confirms that they do not and cannot meet this basic pleading requirement. While they allege that Defendants submit data to (and receive it from) Agri Stats, Plaintiffs have not alleged any *agreement between Defendants*, *i.e.*, "the rim of the wheel." *Musical Instruments*, 798 F.3d at 1192 (explaining that the rim "consists of horizontal agreements among the spokes").

*First*, Plaintiffs' contention that the law allows them to plead a horizontal "rim" by alleging "reciprocal" sharing of information through a third party is simply wrong. (Opp. at 11.) A vague

expectation of "reciprocity"—inherent in any third-party-operated benchmarking service—has never been held sufficient to state a horizontal conspiracy claim. To the contrary, even the cases Plaintiffs cite hold that allegations of an agreement between the "spokes" (as reflected by communications or direct exchanges) are a necessity. In *United States v. Container Corp. of America*, for instance, the complaint alleged direct "request[s] by each defendant of its competitor for information as to the most recent price charged or quoted, whenever it needed such information." 393 U.S. 333, 334–35 (1969). Likewise, *In re Static Random Access Memory (SRAM) Antitrust Litigation* included allegations that the "[d]efendants carried out th[e] conspiracy through in-person, telephone and email communications regarding pricing to customers and market conditions," and the complaint quoted those communications. 580 F. Supp. 2d 896, 899 (N.D. Cal. 2008).

No such allegations of communications or exchanges between Defendants exist here. Plaintiffs do not plead that Defendants communicated directly with one another about Agri Stats data, do not allege that Defendants had any role in developing the benchmarks, and do not allege Defendants met, even once, to discuss Agri Stats. As Plaintiffs' own cases show, this failure is critical. *See Am. Column and Lumber Co. v. United States*, 257 U.S. 377, 397–98 (1921) (defendants *met almost every week* to discuss the surveys and future strategy); *Todd v. Exxon*, 275 F.3d 191, 196 (2d Cir. 2001) (defendants *met with one another* to develop the benchmarks).

*Second*, labeling Agri Stats a "device used by the members of this Cartel to facilitate information gathering and sharing," (Opp. at 13), does not cure Plaintiffs' failure to allege a "rim." Plaintiffs' argument rests on the irrelevant, unpled, and untrue observation that Agri Stats, as a third-party service, does not "benefit" from providing its service whereas participants do. (*Id.*) But Plaintiffs do not allege that the service benefits only the participating companies and not Agri

Stats itself (a for-profit subsidiary of Eli Lilly & Co. (Compl. ¶ 18)).  Nor do Plaintiffs provide any reason why that would be necessary or sufficient to state a Section 1 claim.

Plaintiffs' description of Agri Stats thus contrasts starkly with *United States v. American Linseed Oil*, (cited in Opp. at 12), where the third-party-operated survey participants attended monthly information sharing meetings, were directly involved in developing the price surveys at issue, determined the geographic regions for which the sales data would be reported, and were "parties to an agreement which took away their freedom of action by *requiring* each to reveal to all the intimate details of its affairs."  262 U.S. 371, 383, 389 (1923) (emphasis added).  Indeed, in *American Linseed*, the Supreme Court expressly distinguished that sort of arrangement from normal third-party benchmarking services, explaining that "the ordinary practice of reporting statistics to collectors stops far short of the practice which defendants adopted."  *Id.* at 390.

*Finally*, Plaintiffs' remaining plus factors do not support a conspiracy inference. Specifically, assertions that Agri Stats information is of the type that "typically raises antitrust concern" does nothing to enhance the plausibility of any preceding horizontal agreement.  (Opp. at 15–16.)  That certain Agri Stats information is sensitive does not mean Defendants agreed *with each other* to share it or did so for nefarious, anticompetitive purposes.  Moreover, Plaintiffs cite no case holding that sharing such information with a benchmarking service, alone, is improper.

Plaintiffs are incorrect that Defendants "concede[]" an anticompetitive purpose of "lower[ing] Grower compensation."  (Opp. at 12 (emphasis omitted).)  Plaintiffs plead many categories of data included in Agri Stats reports, and most are completely unrelated to producers' Grower cost data.  (*See* Compl. ¶ 73 (alleging that Agri Stats reports include, *inter alia*, genetics, feed, medicine, mortality, and transportation-cost information).)  Indeed, their Opposition again notes that Agri Stats included "data on everything from costs and capacity for production to

detailed Grower compensation information." (Opp. 5.) Making efficiency-enhancing adjustments based on such benchmarking data is neither suggestive of conspiracy nor tantamount to an anticompetitive purpose. *See, e.g.*, *Stephen Jay Photography, Ltd. v. Olan Mills, Inc.*, 713 F. Supp. 937, 944 (E.D. Va. 1989) (Section 1 "not violated by the dissemination of cost data, notwithstanding an apparent stabilizing effect on price, where no intent to constrain competition was established."), *aff'd*, 903 F.2d 988 (4th Cir. 1990).

## B. Plaintiffs Cannot State A Claim Under the Rule of Reason.

Plaintiffs concede that the rule of reason governs alleged information sharing conspiracies. (Opp. at 10.) Yet the Complaint does not mention the "rule of reason" even once. Because Plaintiffs plead only a *per se* case, their claim must be dismissed for this reason alone. *See, e.g.*, *Texaco, Inc. v. Dagher,* 547 U.S. 1, 7 n.2 (2006) (declining to review an antitrust claim under the rule of reason because plaintiffs had not pled such a claim); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 994 (N.D. Cal. 2015) ("[I]n a motion to dismiss, the Court relies on the words in the Complaint. This is especially true in antitrust cases where a plaintiff is not obliged to plead under each possible [rule of analysis]." (quotations omitted)). Even setting aside this fatal defect, however, Plaintiffs cannot state a rule-of-reason claim because they fail to plausibly allege a relevant geographic market and anticompetitive effects.

### 1. Plaintiffs' Nationwide Market Is Unsupported and Implausible.

Plaintiffs have failed to plead a plausible relevant geographic market as required. None of their responses supports a nationwide market for localized Grower services.

*First*, in an about-face from their *factual* allegations, Plaintiffs claim the relevant market is national because "[a]bsent the conduct challenged . . . Integrators would consider each other to be competitors for Broiler Grow-Out Services" irrespective of region since they could open new plants or incent Growers to move. (Opp. at 24.) This is wrong. Plaintiffs themselves do not

actually allege that producers *ever* considered producers outside their region as competitors for Growers within that region. In fact, the Complaint repeatedly alleges the localized nature of Grower services. (*See* Mot. at 23–24.) Plaintiffs' assertion of a national market based on the purely hypothetical *potential* for one also ignores the relevant question for defining the geographic market: whether Plaintiffs have identified an area "comprised of buyers [of such services, *i.e.*, the alleged conspirators] who are seen by *sellers* [*i.e.*, *Growers*] as being reasonably good substitutes." *Todd*, 275 F.3d at 202 (emphasis added). This inquiry must be grounded in reality—not unsupported speculation that Growers or producers could theoretically "move" across the country. (Compl. ¶ 139; Opp. at 24.) In any event, Plaintiffs' conjecture is belied by their own allegations of "high entry barriers for Integrators," "high exit barriers for Growers," and "localized networks of production." (Compl. ¶¶ 47, 59–62, 92–97.) For these reasons courts have repeatedly recognized the inherently local nature of markets for Grower services. *See, e.g.*, *Wheeler v. Pilgrim's Pride Corp.*, 246 F.R.D. 532, 536 (E.D. Tex. 2007) ("Due to the costs and other logistical concerns . . . growers are typically located within forty to fifty miles of the processing plant in the [chicken producer's] complex.").

*Second*, the relevant market(s) in this case cannot properly become broader simply because producers purchase Grower services in different locales across the country. (*See* Opp. at 24–25.) *See, e.g.*, *Heerwagen v. Clear Channel Commc'ns*, 435 F.3d 219, 230 (2d Cir. 2006) ("Local markets for tickets sales are not transformed into a national market simply because concert tours are coordinated nationally."); *Lantec, Inc. v. Novell, Inc.*, 306 F.3d 1003, 1027 (10th Cir. 2002) (explaining that defendants' sales of products "in several different international markets cannot establish a worldwide [relevant] market" because plaintiffs failed to establish that this was "the area where . . . customers would look to buy" the underlying products). Indeed, Plaintiffs

themselves allege that Grower compensation is set regionally, not nationally. (*E.g.*, Compl. ¶ 153 (alleging that producers "rank their Growers *in a given region* against each other" to determine compensation under the Tournament System) (emphasis added).) This further distinguishes Plaintiffs allegations from the cases they cite, which involved, *inter alia*, prices being set on a *nationwide* basis. (*See* Opp. at 24, 25 n.25.)

*Third*, that market definition can sometimes require fact-intensive analysis does not release Plaintiffs from their obligation to plead a *plausible* market. While courts may "hesitate to grant motions to dismiss for failure to plead a relevant . . . market," "[s]uch hesitancy is unwarranted" where the Court is confronted with "the innate implausibility of [Plaintiffs'] allegations." *Hanger v. Berkley Grp., Inc.*, 2015 WL 3439255, at *9 (W.D. Va. May 28, 2015). Such is the case here, where allegations show that the relevant market is local, not national.

*Finally*, Plaintiffs assert that their failure to allege a plausible relevant market does "not matter" because they allege that the purported co-conspirators "have 98% market share nationally." (Opp. at 26.) Plaintiffs cite no authority and are incorrect. It is black-letter law that the rule of reason requires Plaintiffs to "first establish the relevant product and geographic markets" before market power and anticompetitive effects can be measured. *Murrow Furniture Galleries, Inc. v. Thomasville Furniture Indus., Inc.*, 889 F.2d 524, 528 (4th Cir. 1989). Plaintiffs cannot put the cart before the horse by *assuming* a national market and assembling a collection of alleged co-conspirators to arrive at some combined national market share. *See, e.g.*, *Berlyn, Inc. v. Gazette Newspapers, Inc.*, 223 F. Supp. 2d 718, 731 (D. Md. 2002) ("[P]laintiffs have failed to define any relevant market, which obviously forecloses them from demonstrating any anticompetitive effects within a relevant market, or market power of a defendant."). Indeed, Plaintiffs' market-share allegations overstate Defendants' market power, as Defendants have no

power to affect Grower wages in areas in which they do not purchase Grower services. *See Brown Shoe Co. v. United States*, 370 U.S. 294, 336 (1962) ("The geographic market selected must . . . both correspond to the commercial realities of the industry and be economically significant." (citations omitted)).

### 2.     Plaintiffs Fail to Allege an Anticompetitive Effect on Grower Pay.

Plaintiffs also fail to plausibly allege an anticompetitive effect on Grower pay, and certainly do not offer "proof of *actual* detrimental effects" freeing them from their obligation to plead a plausible market. (Opp. at 26 (quoting *FTC v. Indiana Fed'n of Dentists ("IFD")*, 476 U.S. 447, 460 (1986)).) Plaintiffs do not allege a single fact connecting Defendants' use of Agri Stats to anticompetitively low pay. (*See* Mot. at 25–26.) Asserting merely that alleged participants in a data exchange are "able to constantly monitor each other's compensation levels" and make decisions based on the data is insufficient. (Compl. ¶ 77.) *See, e.g.*, *Prosterman v. Am. Airlines, Inc.*, 2016 WL 7157667, at *4 (N.D. Cal. Dec. 8, 2016) (rejecting allegations that airlines used third-party information exchange to "watch each other like hawks" and "assess changes competitors are making" because "us[ing] information obtained through [a data service] to match or otherwise quickly react to a competitor . . . does not support a § 1 claim").

Plaintiffs do not substantively respond to Defendants' arguments on this issue. Instead, they simply state that the Complaint "contains an entire section devoted to anticompetitive effects" and declare the issue "fact-intensive." (Opp. at 26, 27 & n.28.) But Plaintiffs have the burden to allege facts plausibly suggesting an anticompetitive effect, *see SD3*, 801 F.3d at 432, and they have failed to do so.

Even if Plaintiffs could raise a plausible inference of anticompetitive effect, it would not excuse their failure to allege a plausible relevant market. Plaintiffs misapply *IFD*, which provides a limited exception from the normal requirement that Plaintiffs plead a relevant market for

exceptional cases where direct anticompetitive effects are clear on the face of the complaint. 476 U.S. at 460; *see also Cal. Dental Ass'n v. FTC*, 526 U.S. 756, 770 (1999). Courts have consistently rejected efforts to rely on the same "isolated snippets" from *IFD* as Plaintiffs do to escape the obligation of pleading a relevant market and anticompetitive effects. *Procaps S.A. v. Patheon, Inc.*, 845 F.3d 1072, 1086 (11th Cir. 2016); *see also Republic Tobacco Co. v. N. Atl. Trading Co.*, 381 F.3d 717, 737 (7th Cir. 2004) (explaining that *IFD* simply "stands for the proposition that if a plaintiff can show the *rough contours of a relevant market*, . . . then *direct evidence* of anticompetitive effects can establish the defendant's market power"). Plaintiffs plead neither a plausible market's "rough contours" nor any direct evidence of anticompetitive effect, such as data showing "that [a] defendant has *actually* reduced output or raised prices." *Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1311 (10th Cir. 2017) (emphasis added). Accordingly, they cannot state a rule of reason claim.

## IV. Plaintiffs' PSA Claim Should Be Dismissed.

Plaintiffs concede that their PSA claim is "analytically similar" to their Sherman Act claim. (Opp. at 27.) Because Plaintiffs fail to plead any anticompetitive agreement under the Sherman Act, their PSA claim must also be dismissed.

Plaintiffs are incorrect that they need only show that Defendants' alleged conduct *likely* had an adverse effect on competition (which they have not). (Opp. at 27–28.) This "likely" injury qualifier, which is subject to doubt, applies in PSA cases seeking to "halt unfair trade practices in their *incipiency*." *Farrow v. U.S. Dep't of Agric.*, 760 F.2d 211, 215 (8th Cir. 1985) (emphasis added). It does not apply here, where Plaintiffs challenge longstanding practices.

Even if the PSA can reach "likely" anticompetitive practices, the underlying practice *still* must pose a genuine threat to competition. And courts have rejected the argument, akin to Plaintiffs', "that the mere *potential* suppression or reduction of competition violates the Act." *IBP,*

*Inc. v. Glickman*, 187 F.3d 974, 977 (8th Cir. 1999) (explaining that PSA's focus is on practices that "*unduly* and *arbitrarily*" lower prices paid to contractors). In any event, Plaintiffs have not alleged a "likely" anticompetitive effect at all. Whatever probabilistic standard for injury Plaintiffs are proposing (they do not say), they cannot meet it. The Complaint lacks any allegations of anticompetitive conduct by Koch and Sanderson specifically—not with respect to Grower hiring and not with respect to Grower compensation. This is fatal.

## V.      Plaintiffs Cannot Avoid the Application of the First-Filed Rule.

Plaintiffs argue that the first-filed rule is inapplicable because Koch and Sanderson are not subject to personal jurisdiction in the earlier-filed Oklahoma action. This argument, however, ignores the unique history of Plaintiffs' dual cases. In dismissing Koch and Sanderson, Judge Shelby gave Plaintiffs the option to either refile where all defendants were subject to jurisdiction or proceed in Oklahoma against the remaining defendants. Plaintiffs chose neither, opting instead to file multiple suits and hoping to trigger an MDL. Plaintiffs' plan was unsuccessful, so this Court is left with the later-filed of two virtually identical class actions brought by the same class representatives, premised on the same alleged conspiracy amongst the same co-conspirators, and which assert joint and several liability for the conduct of all alleged co-conspirators. *See* Ex. B, Mem. of Law in Support of Mot. to Consolidate at 2. Thus, "there is no evidence that the dispute cannot be fully adjudicated in [the earlier-filed Oklahoma action]." *See Walton v. N. Carolina Dep't of Agric. & Consumer Servs.*, 2010 WL 11561770, at *2 (E.D.N.C. Mar. 1, 2010) (Dever, J.). Accordingly, "sound judicial administration" warrants dismissing this case pursuant to the first-filed rule. *Id.*

## CONCLUSION

For the foregoing reasons and the reasons stated in Defendants' Motion, the Court should dismiss Plaintiffs' Complaint with prejudice.

Date:  September 4, 2018

Respectfully submitted,

/s/ Daniel E. Laytin, P.C.
Daniel E. Laytin, P.C.
Illinois Bar No. 6257119
Christa C. Cottrell, P.C.
Illinois Bar No. 6284749
Martin L. Roth
Illinois Bar No. 6296464
Stacy Pepper
Illinois Bar No. 6306726
KIRKLAND & ELLIS LLP
300 North LaSalle Street
Chicago, IL 60654
(312) 862-2000
dlaytin@kirkland.com
ccottrell@kirkland.com
martin.roth@kirkland.com
stacy.pepper@kirkland.com

*Counsel for Defendants Sanderson Farms, Inc.,
Sanderson Farms, Inc. (Foods Division),
Sanderson Farms, Inc. (Processing Division), and
Sanderson Farms, Inc. (Production Division)*

/s/ Erik R. Zimmerman
Gregory L. Skidmore
N.C. Bar No. 35571
Erik R. Zimmerman
N.C. Bar No. 50247
Robinson, Bradshaw & Hinson, P.A.
1450 Raleigh Road, Suite 100
Chapel Hill, NC 27517
(919) 328-8800
Fax: 919-328-8790
gskidmore@robinsonbradshaw.com
ezimmerman@robinsonbradshaw.com

*Local Civil Rule 83.1(d) Counsel for Defendants
Sanderson Farms, Inc., Sanderson Farms, Inc.
(Foods Division), Sanderson Farms, Inc.
(Processing Division), and Sanderson Farms, Inc.
(Production Division)*

16

/s/ Scott W. Pedigo
Cable M. Frost
Mississippi Bar No. 100757
Scott W. Pedigo
Mississippi Bar No. 10735
Samuel D. Gregory 104563
Mississippi Bar No.
Baker Donelson Bearman Caldwell & Berkowitz
100 Vision Dr., Suite 400
Jackson, MS 39211
(601) 351-2466
cfrost@bakerdonelson.com
spedigo@bakerdonelson.com

John G. Calender
D.C. Bar No. 939124
Baker Donelson Bearman Caldwell & Berkowitz
901 K Street NW, Suite 900
Washington, DC 20001
(202) 508-3474
Fax: (202) 220-2274
jcalender@bakerdonelson.com

Jessica L. Willson
N.C. Bar No. 52465
Matthew Nis Leerberg
N.C. Bar No. 35406
Smith Moore Leatherwood LLP
Post Office Box 27525
434 Fayetteville St., Suite 2800
Two Hannover Square
Raleigh, NC 27601
(919) 755-8763
Fax: (919) 838-3176
jess.green@smithmoorelaw.com
matt.leerberg@smithmoorelaw.com

*Counsel for Defendants Koch Foods, Inc. and
Koch Meat Co., Inc. (doing business as Koch
Poultry Co.)*

## CERTIFICATE OF SERVICE

On September 4, 2018, I electronically transmitted a true and correct copy of the foregoing document to the Clerk of Court for filing using the CM/ECF system, which will send notification of such filing to all counsel of record.

/s/ Erik R. Zimmerman
Erik R. Zimmerman
NC Bar No. 50247
Robinson, Bradshaw & Hinson, P.A.
1450 Raleigh Road, Suite 100
Chapel Hill, NC 27517
(919) 328-8800
Fax: (919) 328-8790
ezimmerman@robinsonbradshaw.com

*Local Civil Rule 83.1(d) Counsel for Defendants Sanderson Farms, Inc., Sanderson Farms, Inc. (Processing Division), Sanderson Farms, Inc. (Production Division), & Sanderson Farms, Inc. (Foods Division)*

18